**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | |
| Plaintiffs, | **COMPLAINT** **[JURY TRIAL DEMANDED]** |
| -against- | **CASE NO.:** |
| THE CITY OF ROCHESTER, a municipal entity, LA'RON SINGLETARY, MARK L. SIMMONS, HENRY C. FAVOR, MICHAEL PERKOWSKI, MARK VAUGHN, TROY TALADAY, FRANCISCO SANTIAGO, MICHAEL MAGRI, ANDREW SPECKSGOOR, PAUL RICOTTA, JOSIAH HARRIS, FLAMUR ZENELOVIC, MICHAEL HOULIHAN, RANDY BENJAMIN, | |
| Defendants. | |

Plaintiff TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPEREK SHIFFRIN LLP, complaining of the defendants, respectfully alleges, upon information and belief, as follows:

## I.      PRELIMINARY STATEMENT

1.      On March 23, 2020, at approximately 3:20 a.m. Rochester Police Department ("RPD") officers MARK VAUGHN, TROY TALADAY, and FRANCISCO SANTIAGO used deadly physical force against Daniel Prude during a "mental heath" arrest, causing his death. As shown by the officers' body worn camera recordings,[1] when they used force against Mr. Prude,

---

[1] The body worn camera recordings of the incident are hereby incorporated by reference, as if pleaded more fully herein. The videos can be viewed at the following links: the full video produced by the City pursuant to the Freedom of information Law can be viewed here: https://www.dropbox.com/s/stfib866q0lz4t9/RPD%20BWC%20FOIL%20RR20-01479%20-%20CR2020-00061280%20-%20435%20Jefferson%20Ave%20REDO%2007282020%20%20%281%29.mp4?dl=0

he was handcuffed, naked, and sitting on the ground with a "spit sock" over his head—he obviously posed no threat to the safety of the officers or anyone else.

2.      Mr. Prude was in the midst of an acute, manic, psychotic episode. Mr. Prude was unarmed, naked and suffering. He needed help.

3.      Instead, the body worn camera recordings show that MARK VAUGHN pushed down on Mr. Prude's head with his full body weight—essentially doing a triangle pushup on his head—for over two minutes until he stopped breathing. The video shows that Mr. Prude is not resisting or fighting with officers in any way.



4.      At the same time, TROY TALADAY kneeled with his full body weight on Mr. Prude's back, FRANCISCO SANTIAGO held Mr. Prude's legs, and Officers JOSIAH HARRIS,

And a compilation video can be viewed here:
https://www.dropbox.com/s/hmftuybv2jcqemy/Prude_V5_BrighterFix.mp4?dl=0.

ANDREW SPECKSGOOR, PAUL RICOTTA and Sergeant MICHAEL MAGRI stood idly nearby, casually chatted and joked with VAUGHN and TALADAY as Mr. Prude died under their bodyweight.

5.      As a result of the unlawful force used against him, Mr. Prude stopped breathing at approximately 3:22 a.m.; this went unnoticed by the officers because they were not paying attention, but instead were chatting and making jokes at Mr. Prude's expense.

6.      VAUGHN continued to push Mr. Prude's head into the pavement, TALADAY continued to sit on Mr. Prude's back, and SANTIAGO continued to hold down Mr. Prude's legs for over a minute after he stopped breathing. It took over 90 seconds for VAUGHN to notice that Mr. Prude had stopped breathing, and another 15 seconds to ask the EMT for assistance.

7.      Paramedics then performed CPR on Mr. Prude for approximately 17 minutes, administered Epinephrine and Sodium Bicarbonate, and intubated him at approximately 3:41 a.m., and at some point his heart finally began beating on its own again. But it was too late—Mr. Prude's brain had been deprived of oxygen for approximately 20 minutes, leaving him in a vegetative state. A week later, on March 30, 2020, his brother, Joe Prude, was told there was nothing that could be done, and he made the decision to take the decedent, Daniel Prude, off life support.

8.      The medical examiner's report, issued on April 22, 2020, concluded that Mr. Prude's death was a homicide, caused by "complications of asphyxia in the setting of physical restraint."

9.      Nevertheless, in an official report issued five days later, on April 27, 2020, the RPD's Major Crimes Unit—which investigates homicides—concluded that the involved officers acted appropriately and in accordance with their training. Specifically, on April 27, 2020,

Sergeant Flamur Zenelovic issued a final report on behalf of the Major Crimes Unit, which concluded:

> "Investigator's Houlihan, Benjamin and I conducted a complete review of body worn camera footage, surveillance video footage, as well as the reports and interviews of the involved officers and paramedics. *Based upon the investigation, the officers' actions and conduct displayed when dealing with Prude appear to be appropriate and consistent with their training*."

10.     However, Training Bulletin L-58-15, "Non Traditional Deadly Physical Force" explains,

> "Members of the Rochester Police Department (RPD) may use deadly physical force, as defined by Article 10 of the New York State Penal Law, only when the use of deadly physical force is necessary to defend the member or another person from what the member reasonably believes to be the use or imminent use of deadly physical force.
>
> ***
>
> "Officers must consider that many techniques or responses can result in unintentional death or serious physical injury in the circumstances under which they are used. For instance:
>
> "1. **Body positions-** Positional asphyxia may occur when the position of a person's body interferes with respiration, resulting in serious injury or death. Prolonged restraint and struggling, particularly when the lungs are being squeezed while empty, can result in exhaustion. This can occur without the subject being aware of it and can lead to sudden death. The risk of positional asphyxia can increase when a person is restrained in the prone position. Current training dictates that once a member believes the scene is safe, the member would remove a subject from the prone position by placing them on their side, in a seated position on their buttocks, or in a standing position. Bending a subject forward or placing weight on the subject can also have a negative effect on the subject's ability to breathe. Other risk factors that could increase the risk of positional asphyxia include, but are not limited to: obesity, prior cardiac or respiratory problems, and the use of drugs."

11.    Thus, the RPD's conclusion that, "*the officers' actions and conduct displayed when dealing with Prude appear to be appropriate and consistent with their training*," is contradicted by its own written policies.

12.    The RPD's conclusion that "*the officers' actions and conduct displayed when dealing with Prude appear to be appropriate and consistent with their training*," was a result of the internal cover up that began immediately after the incident. On March 23, 2020, at approximately 9:00 a.m., Defendant PERKOWSI, Commanding Officer of the Major Crimes Unit, met with Defendants Sergeant ZENELOVIC, Investigator BENJAMIN and Investigator HOULIHAN, informed that that Mr. Prude had "lost consciousness and went into cardiac arrest while being detained," and assigned them to investigate the circumstances of the incident.

13.    According to Mayor Lovely Warren, that same day, March 23, 2020, Chief SINGLETARY informed her that Mr. Prude had an apparent drug overdose and he failed to inform her of defendants' use of force against Mr. Prude. According to Mayor Warren, after Mr. Prude died on March 30, 2020, SINGLETARY never informed her that he died as a result of the force used by officers, even though your undersigned informed Corporation Counsel and the RPD on April 3, 2020 that Mr. Prude's family intended to bring a wrongful death and civil rights lawsuit, and that the City and RPD were required to preserve all body worn camera recordings and other records related to Mr. Prude's death. That same day, April 3, 2020, your undersigned submitted a request pursuant to the state Freedom of Information Law for all body worn camera recordings and other records related to the incident, which the City simply ignored.

14.    Pursuant to Executive Order 147, when Mr. Prude died on March 30, 2020, the RPD lacked jurisdiction to criminally investigate Mr. Prude's death, yet they proceeded to do so anyways. Defendants HOULIHAN and BENJAMIN interviewed witnesses and VAUGHN,

TALADAY and SANTIAGO, despite lacking jurisdiction to do so. Notably, VAUGHN, TALADAY and SANTIAGO have refused to sit for an interview by the prosecutor from the state Attorney General's office, even though that office has exclusive jurisdiction to criminally investigate Mr. Prude's death and prosecute the involved officers.

15.     On April 16, 2020, Perry Duckles, First Assistant District Attorney at the Monroe County District Attorney's Office, informed the RPD that pursuant to Executive Order 147, the investigation of Mr. Prude's death fell under the jurisdiction of the state Attorney General's Office. Nevertheless, the Major Crimes Unit continued to investigate the incident and on April 27, 2020, issued its report and concluded that the defendant RPD officers did not commit a crime. This ensured that the officers faced no disciplinary action until after the horrific video of the defendant RPD officers killing Mr. Prude was made public by his family[2] on September 2, 2020—over five months after the incident.

16.     The City and RPD's cover up of Mr. Prude's death and refusal to discipline the defendant RPD officers is standard operating procedure. In fact, Mr. Prude's death was caused by the policy, practice and customs of the City and RPD that condones and encourages officers to use excessive force as a matter of course, and to lie in official police paperwork and sworn testimony to justify their unlawful actions. The RPD's policy, practice and custom of utilizing force without justification is caused by the willful failure of the City and the RPD to discipline officers who engage in misconduct, and particularly the failure to discipline officers who use force without justification.

---

[2] The City unlawfully refused to produce the officer's body worn camera recordings to the family for over four months. Your undersigned first requested the video on April 3, 2020 under the Freedom of Information Law, but the City refused to produce the video, without any legal justification, until August 20, 2020.

17.     The City's overt failure to discipline has created a culture within the RPD that encourages officers to retaliate against individuals for their putative failure to display the degree of deference or subservience demanded by the arresting officers by using force against them without justification, then fabricating their account of the incident in police paperwork to conceal their unlawful actions. That is exactly what happened here.

18.     Mr. Prude's death was also caused by the City and RPD's deliberate indifference to the widespread and longstanding unconstitutional policy, practice and custom of officers using excessive force against individuals suffering from mental illnesses, both chronic and acute. The RPD does not provide any training, either at the police academy or in-service, regarding how to safely and lawfully interact with individuals suffering from chronic or acute mental illnesses. Moreover, the City and RPD has persistently failed to discipline officers who use excessive force during interactions with individuals suffering from chronic and acute mental illnesses. The City and RPD were aware of the longstanding and widespread problem of its officers using excessive force against individuals during "mental health" arrests but failed to take any remedial action. The City's deliberate indifference caused Mr. Prude's death.

19.     Plaintiff TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, brings this civil rights lawsuit against the City of Rochester to challenge the unlawful municipal policies, practices and customs of the City and RPD as carried out against Mr. Prude through the wrongful acts and omissions of certain of the employees and agents of the RPD— causing his death. Plaintiff seeks relief for the violation of Daniel Prude's rights secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Section 1983, of his rights secured by the First, Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff seeks damages,

both compensatory and punitive, and award of costs and attorney's fees, and such other and further relief as this court deems just and proper.

## II.     Venue and Jurisdiction

20.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

21.     Venue is proper for because the events occurred in this district.

## III. JURY DEMAND

22.     The Plaintiff respectfully demands a trial by jury of all issues in this matter.

## IV. PARTIES

23.     Plaintiff TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE is a citizen of the United States and a resident of the Cook County, Illinois. On August 24, 2020, the Surrogate's Court, County of Monroe, State of New York, issued letters of administration to TAMESHAY PRUDE, naming her as the personal representative of the estate, empowered to bring this lawsuit.

24.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York and is located in the Western District of New York.

25.     Defendant CITY is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of

police officers as said risks attach to the public consumers of the services provided by the Rochester Police Department.

26.     Defendant LA'RON SINGLETARY ("Chief Singletary") is the Chief of the Rochester Police Department. Defendant Singletary was appointed to this role or about August 6, 2019. Before his appointment as Chief, Defendant SINGLETARY was Deputy Chief of the Rochester Police Department. In his capacity as both Chief, he is responsible for implementing the policy, practice, supervision, implementation and conduct of all RPD matters, including the appointment, training, supervision and conduct of all RPD personnel. In addition, Defendant SINGLETARY is responsible for enforcing the rules of the RPD and ensuring that RPD personnel obey the laws of the United States and the State of New York, including by conducting thorough and expeditious investigations into officer misconduct. At all relevant times, Defendant SINGLETARY was acting within the scope of his employment and under color of state law. Defendant SINGLETARY being sued in his individual and official capacities.

27.     MARK L. SIMMONS is Rochester Police Deputy Chief of Administration ("DCA SIMMONS"), and Commander of the Administration Bureau of the Rochester Police Department, which oversees the Professional Development Section ("PDS"). In his capacity as both Commander of the PDS, he is responsible for implementing the policy, practice, supervision, and conduct of all PDS matters, including developing, coordinating and administering RPD In-Service and Recruit Training programs, along with use-of-force and Defensive Tactics training. As Commanding Officer, SIMMONS is a municipal policymaker with respect to the RPD's use-of-force and Defensive Tactics training and policies. At all relevant times, Defendant SIMMONS was acting within the scope of his employment and under color of state law. Defendant SIMMONS is being sued in his individual and official capacities.

28.     HENRY C. FAVOR is Commander of the Special Operations Division ("SOD") of the Rochester Police Department, which oversees the Crisis Intervention Team ("CIT"). In his capacity as both Commander of the SOD, he is responsible for implementing the policy, practice, supervision, implementation and conduct of all CIT matters, including the appointment, training, supervision and conduct of all CIT personnel. In addition, Defendant FAVOR is responsible for enforcing the rules of the CIT and ensuring that CIT personnel respond to incidents involving emotionally disturbed persons, as appropriate. At all relevant times, Defendant FAVOR was acting within the scope of his employment and under color of state law. Defendant FAVOR is being sued in his individual and official capacities.

29.     Defendant Lieutenant MICHAEL PERKOWSKI ("Lieutenant PERKOWSKI") is Commanding Officer of the Major Crimes Unit at the Rochester Police Department. As such, he was, at all times relevant herein, responsible for training all members of the Major Crimes Unit, including homicide investigators, including ZENELOVIC, BENJAMIN and HOULIHAN, and was in command of the investigation of the incident that caused Mr. Prude's death. As Commanding Officer, PERKOWSKI is a municipal policymaker with respect to the RPD's Major Crimes Unit and its investigation of homicides. At all relevant times, Defendant PERKOWSKI was acting within the scope of his employment and under color of state law. Defendant PERKOWSKI is being sued in his individual and official capacities.

30.     Defendants Rochester Police Department ("RPD") POLICE OFFICER ("P.O.") MARK VAUGHN ("VAUGHN"), P.O. TROY TALADAY ("TALADAY"), FRANCISCO SANTIAGO ("SANTIAGO"), ANDREW SPECKSGOOR ("SPECKSGOOR"), P.O. PAUL RICOTTA ("RICOTTA"), P.O. JOSIAH HARRIS ("HARRIS"), SERGEANT MICHAEL MAGRI ("MAGRI"), SERGEANT FLAMUR ZENELOVIC ("ZENELOVIC"),

INVESTIGATOR MICHAEL HOULIHAN ("HOULIHAN"), INVESTIGATOR RANDY BENJAMIN ("BENJAMIN"), LIEUTENANT MICHAEL PERKOWSKI ("PERKOWSKI"), ("Defendant RPD Officer(s)," or Defendant Police Officer(s)"), are and were at all times relevant herein, officers, employees and agents of the Defendant City and the RPD. The Defendant RPD Officers are being sued in their individual and official capacities.

31.     At all times relevant herein, the individual Defendant RPD Officers were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the Defendant CITY, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the RPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the RPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the RPD.

32.     The individual Defendant Police Officers' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of plaintiff's rights.

## V.  STATEMENT OF FACTS

### A.  Allegations Common to All Causes of Action

33.     On March 23, 2020, at approximately 3:16 a.m., VAUGHN arrived at the intersection of Jefferson Avenue and Dr. Samuel McCree Way, Rochester, New York, where he found the decedent, Daniel Prude, naked and kneeling in the street.

34.     VAUGHN immediately ordered Mr. Prude to "get on the ground," and he complied and laid face down on the cold, wet street.

35.     VAUGHN then ordered Mr. Prude to put his hands behind his back, and he complied.

36.     VAUGHN then immediately placed handcuffs upon Mr. Prude's wrists, without incident.

37.     VAUGHN then stated, "well that was easy and fast."

38.     Within the next minute, TALADAY, SANTIAGO, MAGRI, SPECKSGOOR, RICOTTA and HARRIS all arrive at the scene.

39.     As Mr. Prude sat on the ground, naked and handcuffed behind his back, he was obviously in the throes of an acute, manic, psychotic episode. Between prayers and profanities and demands for money or a cigarette or a gun, he spat on the street, ignoring officers' commands to stop, the officers' body worn camera footage shows.

40.     However, when the officers ask him questions, he answers. SPECKSGOOR asks him if his name is "Daniel," and he responded "yes, sir." TALADAY asked him if he had AIDS or HIV, and he responded "no."

41.     Nevertheless, the officers failed to use any basic communication skills to calm or comfort Mr. Prude or use any basic de-escalation tactics.

42.     Instead, the officers casually chatted among themselves, mocked Mr. Prude and made jokes at his expense.

43.     The defendant RPD Officers then decided to put a spit sock on his head, without any discussion of how that might affect him or exacerbate his manic condition.

44.     At 3:19:13, VAUGHN placed a spit sock over Mr. Prude's head.

45.     Then, for approximately one minute, Mr. Prude continued to switch between laying and sitting on the ground, handcuffed behind his back and blinded by the spit sock, while variously demanding that the officers take the spit sock off his head and stating "get me that gun."

46.     At 3:20:15, Mr. Prude spits several times inside of the spit sock, and slides on his buttocks towards TALADAY.

47.     TALADAY, VAUGHN and SANTIAGO then swarmed Mr. Prude. VAUGHN stated, "no, you're going to stay down," and the three officers pushed Mr. Prude down to the ground, slamming his head and body onto the pavement, without justification or lawful purpose.

48.     VAUGHN then put both his hands on the side of Mr. Prude's head and pushed down with his full body weight—essentially in a triangle pushup or "tripod" position. The body worn camera recordings show that VAUGHN remains in this position—pushing his full body weight down on Mr. Prude's head—for over two minutes and 15 seconds, until approximately 3:22:34 a.m.

49.     At the same time, the body worn camera recordings show TALADAY placed his knee on Mr. Prude's back, and sat on him with his full body weight, for over two minutes.

50.     Both VAUGHN and TALADAY weighed approximately 180–200 pounds, and were wearing approximately 20–40 pounds of equipment. Thus, for over two minutes, the officers pushed down with over 400 pounds of weight on Mr. Prude's head and back as he laid naked on the ground, handcuffed and defenseless, and blinded by the spit sock, until he stopped breathing.

51.     Throughout this time, Mr. Prude cried out for help and pleaded for the officers to get off of him. He can be heard aspirating. Nevertheless, VAUGHN and TALADAY continued to hold Mr. Prude down with their full bodyweight as they mocked the things he was saying and chatted casually with each other and the paramedic.

52.     At 3:21:07–3:21:10 a.m., while standing just feet away, HARRIS stated, "relax dude or you'll end up getting TASED."

53.     At no time did HARRIS intervene to stop or prevent the unlawful use of force against Mr. Prude, despite having the time, opportunity and legal obligation to do so.

54.     At 3:21:35 a.m., an officer stated, "stop spitting," and SANTIAGO then got on the ground and held down Mr. Prude's lower body.

55.     At 3:21:40 a.m., VAUGHN placed his knee on the side of Mr. Prude's head, told him to "stop spitting," and then returned to the "triangle pushup" or "tripod" position at 3:21:44 a.m.

56.     At 3:22:00 a.m., TALADAY drove his knee into Mr. Prude's back with great force, without justification or lawful purpose.

57.     At 3:22:00 a.m., Mr. Prude took his last audible gasp, and his body went completely motionless. The officers did not notice, however, because they were casually chatting and joking among themselves and with the paramedic.

58.     At 3:22:34 a.m., VAUGHN stated, "you good man," and tapped Mr. Prude's head several times. Even though Mr. Prude was unresponsive, neither VAUGHN nor any other defendant RPD officers immediately notified the EMT or paramedic, nor took any other life saving measures. By this time, VAUGHN, TALADAY and SANTIAGO knew or should have known that Mr. Prude was not breathing and had gone into cardiac arrest, but they failed to alert the EMT for over one minute.

59.     At 3:22:42 a.m., Mr. Prude expelled water from his mouth, and VAUGHN stated, "oh he's puking, just straight water." However, neither VAUGHN nor any other officer removed the spit sock to check if Mr. Prude was breathing and to prevent him from choking hon his vomit.

60.     At 3:22:56 a.m., VAUGHN stated, "my man, you puking" and again tapped his head—but again, Mr. Prude was unresponsive.

61.     Throughout this time, TALADAY held his knee on Mr. Prude's back, until 2:23:02 a.m., over a minute after Mr. Prude had stopped breathing and gone into cardiac arrest.

62.     Between 2:23:02 and 3:23:34 a.m., VAUGHN and TALADAY continued to hold Mr. Prude down on the ground.

63.     At 3:23:23 a.m., VAUGHN asked TALADAY, "is he still moving his arm?" TALADAY then picked up and dropped Mr. Prude's limp arm.

64.     At 3:23:34 a.m. VAUGHN stated, "it doesn't look like he's got any chest compressions" and ordered TALADAY to "roll him over on his side."

65.     VAUGHN and TALADAY then informed the EMT and that Mr. Prude did not have "chest compressions", and the EMT began performing CPR—over 90 seconds after Mr. Prude stopped breathing and went into cardiac arrest.

66.     But it was too late. They were unable to get Mr. Prude's heart to beat again on its own until approximately 3:41 a.m. after he was intubated. By that time, his brain had not received oxygen for approximately 20 minutes, and he was brain dead.

67.     The ambulance transported Mr. Prude to Strong Memorial Hospital where he was placed on life support for one week. On March 30, 2020, the doctors told his brother, Joe Prude, that there was nothing that could be done, and he made the decision to take the decedent, Daniel Prude, off life support. He died that day.

68.     On April 22, 2020, the Monroe County Medical Examiner issued the autopsy report, concluding that Mr. Prude's death was a homicide, caused by "complications of asphyxia in the setting of physical restraint."

**B. Facts pertinent to municipal liability claims against the City of Rochester.**

69.     Immediately after the incident, on March 23, 2020, the RPD took steps to begin covering up the fact that the defendant officers murdered Daniel Prude.

70.     On March 23, 2020, at approximately 9:00 a.m., Defendant PERKOWSI, Commanding Officer of the Major Crimes Unit, met with Defendants Sergeant ZENELOVIC, Investigator BENJAMIN and Investigator HOULIHAN, informed them that Mr. Prude had "lost consciousness and went into cardiac arrest while being detained," and assigned them to "investigate" the circumstances of the incident.

71.     According to Mayor Lovely Warren, that same day, March 23, 2020, Chief SINGLETARY lied to her and told her that Mr. Prude had an apparent drug overdose while in police custody. In fact, according to Mayor Warren, SINGLETARY never even told her that the defendant Police Officers used force against Mr. Prude—despite your undersigned having served a preservation letter on April 3, 2020, which was acknowledged by the Deputy Corporation Counsel the same day, that informed the City that Mr. Prude's family planned to bring a lawsuit because they believed his death was caused by unnecessary force used by the police officers during the March 23, 2020 incident. Mayor Warren also claims that she was not informed that her officers had used force against Mr. Prude even though the Attorney General's office was investigating the incident pursuant to Executive Order 147—which grants that office exclusive jurisdiction to criminally investigate and prosecute law enforcement officers who cause the death of unarmed civilians in law enforcement custody. Mayor Warren claims that she did not know that the defendant Police Officers used of force against Mr. Prude until August 4, 2020 when corporation counsel allegedly showed her the video for the first time—even though Mr. Prude's family filed a Notice of Claim on July 27, 2020, which was received by the City on July 30,

2020, and which detailed the unlawful force used against Mr. Prude by the defendant Police Officers, causing his death.

72.     Thus, from the day of the incident, the RPD's strategy was to blame the victim, Mr. Prude, for his own death, in an attempt to cover up the fact that he was murdered by the Defendant Police Officers. Chief SINGLETARY apparently misrepresented to  to Mayor Warren exactly what happened and never told her that the defendant police officers used force against Mr. Prude without justification, causing his death.

73.     On March 30, 2020, the RPD was informed by Strong Memorial Hospital that Mr. Prude had died from his injuries. Yet, instead of immediately referring the case to the Attorney General's Officer, as required by Executive Order 147, the Major Crimes Unit immediately set up interviews with all the involved officers and witnesses. Notably, to date, the defendant Police Officers have refused to be interviewed by the Attorney General's Office.

74.     On April 13, 2020, Defendants HOULIHAN and BENJAMIN interviewed VAUGHN, and they concluded that his "account was consistent with the BWC footage, as well as the copies of the Incident Report that he filed in connection with the MHA arrest of Prude … and his Subject Resistance Report."

75.     This conclusion is false. In his Subject Resistance Report, VAUGHN falsely stated that that Mr. Prude was "avoiding custody" and was "assaultive" towards police officers. He falsely claimed that Mr. Prude "spit through the spit sock"; that he "segmented" Mr. Prude's head and that he utilized a "hypoglossal nerve technique" on him; however, the body worn camera recordings show that while Mr. Prude was spitting, it did not go "through" the spit sock, and that VAUGHN did not use any trained RPD techniques. Instead, the body worn camera

video shows VAUGHN applying all his body weight to Mr. Prude's head for over two minutes as he pushed down on him in a "triangle pushup" or "tripod" position.

76.     On April 13, 2020, Defendants HOULIHAN and BENJAMIN also interviewed TALADAY. They concluded that, "Officer TALADAY's interview was the same as the details that he documented in his IAR and SRR for the incident occurring at 435 Jefferson Av, as it was with the BWC footage captured and retained as a part of this event."

77.     Again, this conclusion is false, as the claims in TALADAY's Subject Resistance Report are contradicted by the body worn camera recordings. Specifically, like VAUGHN, TALADAY falsely claims that Mr. Prude was "avoiding custody" and was "assaultive" towards police officers. TALADAY also falsely claimed that he continually monitored Mr. Prude's inhalations "by observing the movement of his back."

78.     On April 14, 2020, Defendants HOULIHAN and BENJAMIN interviewed SANTIAGO. They claimed that, "[t]he interview was brief, as Officer Santiago's involvement with Daniel Prude was also brief," that he "assisted with the arrest" and that his "account of his involvement did not differentiate from the documentation that he prepared for the incident (that being his SRR)."

79.     Again, this conclusion is false, as the claims in SANTIAGO'S Subject Resistance Report are contradicted by the body worn camera recordings. First, the body worn camera recordings demonstrate that SANTIAGO's interaction with Mr. Prude was not "brief", but instead that he held Mr. Prude's legs on the ground while VAUGHN and TALADAY applied their full body weight on his head and back, and thus contributed to his death. Instead of intervening to prevent the unlawful force used against Mr. Prude by VAUGHN and TALADAY, SANTIAGO contributed to his death by holding his body on the ground for approximately two

minutes until he stopped breathing and went into cardiac arrest. This use of force was anything

but "brief". SANTIAGO also falsely claims that Mr. Prude was "avoiding custody" and was

"assaultive" towards police officers, and falsely claimed that Mr. Prude was "kicking his legs

back and forth in an attempt to break loose."

80.     On April 22, 2020, HOULIHAN and BENJAMIN interviewed EMT Brett Barnes,

who described the force used by VAUGHN as "tripoding" his head, while another officer had a

knee across his back.

81.     The same day, on April 22, 2020, the Monroe County medical examiner issued

the autopsy report, which concluded that Mr. Prude's death was a homicide, caused by

"complications of asphyxia in the setting of physical restraint."

82.     Nevertheless, in an official report issued five days later, on April 27, 2020, the

RPD's Major Crimes Unit—which investigates homicides—concluded that the involved officers

acted appropriately and in accordance with their training. Specifically, on April 27, 2020,

Sergeant Flamur Zenelovic issued a final report on behalf of the Major Crimes Unit, which

concluded:

> "Investigator's Houlihan, Benjamin and I conducted a complete
> review of body worn camera footage, surveillance video footage,
> as well as the reports and interviews of the involved officers and
> paramedics. *Based upon the investigation, the officers' actions and
> conduct displayed when dealing with Prude appear to be
> appropriate and consistent with their training*."

83.     This conclusion is directly contradicted by RPD Training Bulletin L-58-15, "Non

Traditional Deadly Physical Force", which states:

> "Members of the Rochester Police Department (RPD) may use
> deadly physical force, as defined by Article 10 of the New York
> State Penal Law, only when the use of deadly physical force is
> necessary to defend the member or another person from what the

- 19 -

member reasonably believes to be the use or imminent use of deadly physical force.

***

"Officers must consider that many techniques or responses can result in unintentional death or serious physical injury in the circumstances under which they are used. For instance:

"1. **Body positions-** Positional asphyxia may occur when the position of a person's body interferes with respiration, resulting in serious injury or death. Prolonged restraint and struggling, particularly when the lungs are being squeezed while empty, can result in exhaustion. This can occur without the subject being aware of it and can lead to sudden death. The risk of positional asphyxia can increase when a person is restrained in the prone position. Current training dictates that once a member believes the scene is safe, the member would remove a subject from the prone position by placing them on their side, in a seated position on their buttocks, or in a standing position. Bending a subject forward or placing weight on the subject can also have a negative effect on the subject's ability to breathe. Other risk factors that could increase the risk of positional asphyxia include, but are not limited to: obesity, prior cardiac or respiratory problems, and the use of drugs."

84.     Thus, the RPD's conclusion that, "*the officers' actions and conduct displayed when dealing with Prude appear to be appropriate and consistent with their training,*" is false and was apparently issued by the Major Crimes Unit—under the control and direction of PERKOWSKI—in order to cover up the fact that VAUGHN, TALADAY and SANTIAGO murdered Mr. Prude, while MAGRI, SPECKSGOOR, RICOTTA, and HARRIS stood idly nearby, chatting and making jokes, and failing to intervene as Mr. Prude died under the weight of three VAUGHN, TALADAY and SANTIAGO.

85.     The failure of the City and RPD to discipline the defendant officers in this incident until after the decedent's family released the horrific video of his murder at the hands of

the defendant RPD officers is part of a longstanding, entrenched policy, pattern and custom of deliberate indifference to RPD officers' use of excessive force.

86.     The failure of the City and RPD to investigate or discipline the defendant officers in this incident is part of a longstanding, entrenched policy, pattern and custom of deliberate indifference to RPD officers' lying about the circumstances that led to the arrest and use of force against arrestees in official police paperwork, charging documents, and court testimony.

87.     The City's policy and custom of failing to discipline officers who use excessive force and lie about the reasons for using force caused Mr. Prude to be brutally murdered by the defendant RPD officers.

88.     Because of the foregoing, Plaintiff demands judgment against Defendants in an amount of money to be determined at trial, and injunctive relief as further detailed below.

## VI.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF PLAINTIFF'S FOURTH AMENDMEMNT RIGHTS UNDER 42 U.S.C.**
**§ 1983 ARISING FROM DEFENDANTS' USE OF EXCESSIVE FORCE**
**(Against VAUGHN, TALADAY and SANTIAGO)**

89.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

90.     Defendants VAUGHN, TALADAY and SANTIAGO used force to slam Mr. Prude onto the ground when he was naked, sitting on the ground, handcuffed behind his back, and blinded by the spit sock over his head.

91.      VAUGHN then pushed down on Mr. Prude's head with his full bodyweight for over two minutes, until he stopped breathing and went into cardiac arrest.

92.     At the same time, TALADAY sat his knee across Mr. Prude's back with his full bodyweight for over two minutes, until he stopped breathing and went into cardiac arrest.

93.     At the same time, SANTIAGO held down Mr. Prude's legs for over two minutes, until he stopped breathing and went into cardiac arrest.

94.     At no point during the incident described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD OFFICERS against Mr. Prude.

95.     As a result, Mr. Prude suffered physical pain and terror, and ultimately died. Plaintiff seeks compensation in an amount to be determined at trial.

96.     Defendants committed the foregoing violations of decedent's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference.

97.     By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. §1983**
**ARISING FROM DEFENDANTS' FAILURE TO INTERVENE**
**(Against MAGRI, SPECKSGOOR, RICOTTA, HARRIS and SANTIAGO)**

98.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

99.     MAGRI, SPECKSGOOR, RICOTTA and HARRIS had an affirmative duty to intercede on decedent's behalf to prevent and stop the violation of his constitutional rights by VAUGHN, TALADAY and SANTIAGO.

100.    MAGRI, SPECKSGOOR, RICOTTA and HARRIS failed to intervene on decedent's behalf despite having had a realistic opportunity to do so, and despite having substantially contributed to the circumstances within which decedent's rights were violated by their affirmative conduct.

101.    SANTIAGO had an affirmative duty to intercede on decedent's behalf to prevent and stop the violation of his constitutional rights by VAUGHN and TALADAY.

102.    SANTIAGO failed to intervene on decedent's behalf despite having had a realistic opportunity to do so, and despite having substantially contributed to the circumstances within which decedent's rights were violated by their affirmative conduct.

103.    As a result of the aforementioned conduct of the Defendant RPD OFFICERS, decedent's constitutional rights were violated.

104.    As a result, decedent was damaged, injured, harmed, and died, and Plaintiff seeks compensation in an amount to be determined at trial.

105.    Defendants committed the foregoing violations of decedent's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference.

106.    By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**THIRD CLAIM FOR RELIEF**
**SUPERVISORY LIABILITY under 42 U.S.C. § 1983**
**(Against SINGLETARY, SIMMONS, FAVOR, PERKOWSKI)**

107.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

108.    SINGLETARY, SIMMONS, FAVOR, PERKOWSKI personally caused decedent's constitutional injuries by being deliberately or consciously indifferent to the rights of others in failing to properly supervise, train, and discipline their subordinate employees.

109.    As a result, decedent was damaged, injured and harmed, and seek compensation in an amount to be determined at trial.

110.    As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

111.    Defendants committed the foregoing violations of decedent's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to decedent's constitutional rights or to the effect of such misconduct upon Plaintiffs constitutional rights.

112.    By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**FOURTH CLAIM FOR RELIEF**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**(Against City; Defendant Police Officers)**

113.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

114.    The Defendant CITY and the Defendant Police Officers have acted under color of law to deprive decedent of his civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to Plaintiff under 42 USC §1983.

115.    The body worn camera recordings demonstrate that before any force was used against decedent, the officers knew that he was in the throes of an acute, manic, psychotic episode, and that he required medical treatment.

116.    Despite decedent's obvious need for medical treatment, and the fact that he was incoherent, handcuffed, blinded by the spit sock, and posed no threat to the safety of the Defendant RPD officers or anyone else, VAUGHN, TALADAY and SANTIAGO deprived him of the opportunity to receive medical treatment by instead using force against him without justification, killing him. The decision to use force against decedent instead of waiting for the

ambulance to arrive and provide needed medical treatment constituted deliberate disregard towards decedent's serious medical needs and the substantial risk of serious harm he faced.

117.    Decedent was not otherwise provided with an opportunity to receive medical attention.

118.    The RPD officers deprived decedent the opportunity to receive medical attention after the ambulance arrived, because VAUGHN, TALADAY and SANTIAGO held him on the ground for over a minute after he stopped breathing and had gone into cardiac arrest.

119.    Because decedent was refused immediate medical treatment while he was in custody, he suffered from extreme pain, horror and died.

120.    Decedent died because the officers refused to stop using force against him when the ambulance arrived and refused to allow the EMT and paramedic to provide him with immediate medical treatment before he stopped breathing and went into cardiac arrest.

121.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against defendants in a sum of money to be determined at trial.

122.    Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiffs constitutional rights or to the effect of such misconduct upon Plaintiffs constitutional rights.

123.    By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**FIFTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM THE DEFENDANT CITY'S DELIBERATE INDIFFERENCE AND FAILURE TO DISCIPLINE RPD OFFICERS WHO USE EXCESSIVE FORCE—EVEN WHEN THE UNLAWFUL USE OF FORCE IS CAPTURED ON VIDEO**
**(Against the City)**

124.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

125.    The Defendant City and the RPD, by and through Defendants SINGLETARY and SIMMONS, have deliberately and systemically failed to discipline RPD Officers who use force without justification, even when said unlawful use of force is captured on video.

126.    The need for said discipline is presently and patently obvious, as numerous RPD Officers, including the Defendant RPD OFFICERS, have repeatedly used force without justification.

127.    The City and RPD, by and through Defendants SINGLETARY and SIMMONS, caused Mr. Prude's death by failing to discipline the defendant RPD officers when they used excessive force against arrestees on numerous occasions prior to March 23, 2020, causing them to repeat their unlawful use of force against Mr. Prude, because they knew to a moral certainty that there would be no consequences for their use of excessive force. Many of these use of force incidents were captured on video, but the City and the RPD failed to impose any discipline on the officers.

128.    The failure of the Defendant CITY and the RPD to maintain standards governing the imposition of discipline when the Defendant RPD OFFICERS and their fellow officers use force without justification, even when the force is captured on video, constitutes an unconstitutional municipal policy, practice and custom.

129.    By failing to discipline officers who use force without justification—even when the unlawfulness of the force used is demonstrated by clear video evidence—the Defendant City and the RPD have demonstrated their deliberate indifference to the constitutional deprivations

caused by RPD Officers' repeated use of force without justification and their failure to accurately document use-of-force incidents.

130.    The Defendant City and the RPD have had actual and/or constructive knowledge of the pervasive and widespread practice of RPD officers' use force without justification for many years, but has failed to take any affirmative steps to end the practice—like disciplining officers who use excessive force.

131.    Instead, the Defendant City and the RPD have demonstrated their deliberate indifference to the pervasive and widespread practice of RPD officers' use of excessive force by encouraging RPD Officers to use force without justification through granting awards and promotions to the Defendant RPD OFFICERS and their fellow officers who have repeatedly used force without justification.[3]

132.    While the RPD has never undertaken any internal study of the use of excessive force by its officers, and statistics on these practices are not available, there is extensive evidence of a permanent, longstanding, and widespread practice of the Defendant CITY and RPD failing to discipline RPD Officers who have used force without justification.

133.    While the RPD has never undertaken any internal study of the use of excessive force by its officers and so no accurate statistics on RPD Officers use of force, statistics from other jurisdictions that do collect data shows that where an officer who uses excessive force is not disciplined following their unlawful use of force, they are more likely to use excessive force again in the future.

---

[3] *See*, Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy; Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a-norford-files-7-million-civil-suit-against-rochester-police/87382790/. Articles incorporated by reference herein.

134. The fact that the Defendant CITY and RPD deliberately fail to discipline RPD Officers who use excessive force in the course of effectuating arrests constitutes an unlawful municipal policy, which has created a culture within the RPD where officers are permitted and encouraged to use excessive force during routine interactions with individuals in the City of Rochester, in violation of the Fourth Amendment to the United States Constitution.

135. Instead of implementing reforms to ensure that officers are disciplined for using excessive force to prevent the use of force *ex ante*, the Defendant CITY and RPD have demonstrated their deliberate indifference to RPD Officers use of force by permitting RPD Officers to be trained in various *ex post* justifications for their unlawful use of force by Bill Lewinski, a self-proclaimed "police psychologist." [4]

136. Mr. Lewinski has been precluded from testifying on behalf of defendant police officers in by numerous federal courts because they found that his testimony lacked any scientific foundation.[5]

---

[4] See David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT & CHRONICLE (Sept. 6, 2017), http://www.democratandchronicle.com/story/news/local/columnists/andreatta/2017/09/06/roches ter-backpedals-controversial-police-training/639216001/; Transcript of Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009).

[5] See, e.g., *Miller v. City of Los Angeles,* Case No. Case 5:07-cv-00806-VAP-CT (C.D. Calif.), (the Court granted a motion *in limine* to exclude Lewinski's testimony "because his testimony lacks the requisite scientific foundation."); In *Tubar v. Clift,* CASE NO. C05-1154-JCC (W.D. Wash. 2009)(the Court limited Lewinski's testimony, recognizing that many of his proposed opinions were outside of his purported area of expertise); *White vs. Gerardot,* 2008 U.S. Dist. LEXIS 87761 (N.D. Ind. October 24, 2008) (limiting Lewinski's testimony because his proposed opinions lacked scientific foundation); *ADT Sec. Servs. v. Swenson,* 2011 U.S. Dist. LEXIS 28947 (D. Minn. 03/21/2011) (Court limited Lewinski's testimony and expressed concern about his proposed reenactment, reserving ruling until an evidentiary hearing outside the presence of the jury); *Lopez v. Chula Vista Police Department,* Case No. 07cv1272-WQH-BLM (S.D. Calif. February 18, 2010) (the Court likewise severely limited Lewinski's testimony and stated that he was not qualified to give the majority of the opinions (all but one) that he planned to give); *State of New Mexico* v. *Perez*, D-202-cr-2015-000105 (Aug. 24, 2015) (the Court precluded Mr.

137.    For example, Mr. Lewinski is an advocate for the junk science known as anthropometry, and has trained police officers to note the length of an arrestees' fingers in their official police paperwork as evidence of the individual's genetic predisposition for aggressiveness when attempting to justify the officers' use of force *ex post*.[6]

138.    Mr. Lewinski's opinions are so thoroughly lacking in any scientific foundation and offensive to common sense that when he has testified in court on behalf of defendant police officers in excessive force cases, the trial court judge and the jury have audibly laughed at him. [7]

139.    RPD Officers' use of force without justification is no laughing matter—yet the Defendant CITY and RPD have demonstrated their deliberate indifference to the pervasive and widespread use of force without justification by permitting RPD Officers to attend a use-of-force training by Bill Lewinski and his so-called Force Science Institute, where the Defendant RPD OFFICERS and their fellow officers learned various pseudoscientific techniques to avoid being held accountable for their unlawful actions, such as justifying their use of force against an individual based on anthropometry.

### THE CITY AND RPD HAVE AN OFFICIAL POLICY, PRACTICE AND CUSTOM OF FAILING TO DISCIPLINE OFFICERS WHO USE EXCESSIVE FORCE—EVEN WHEN SAID INCIDENTS ARE CAPTURED ON VIDEO

**A. The May 5, 2018 incident where Officers Spenser McAvoy and Michael Sippel brutally beat Christopher Pate demonstrates the RPD is infected with a culture**

---

Lewinski from testifying regarding an officer's attention or memory in lethal force encounters, and from testifying regarding any officer's perception of what was occurring during the encounter at issue in that case, as such testimony "would be speculative rather than scientific").

[6] See David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT & CHRONICLE (Sept. 6, 2017), http://www.democratandchronicle.com/story/news/local/columnists/andreatta/2017/09/06/rochester-backpedals-controversial-police-training/639216001/; Transcript of Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009).

[7] *See, e.g.*, Cross Examination of Bill Lewinski at 63-66, *Davidson* v. *Chicago*, No. 06-L-1577 (Sept. 24, 2009) [transcript on file with Plaintiff's attorney].

**of racism, and that the City and RPD have failed to address systemic problems of racism and use of excessive force.**

140.　　The May 5, 2018 incident involving Christopher Pate demonstrates that the RPD is permeated by a culture of racism that infects all aspects of its operations. The actions of the officers who used force against Mr. Pate was motivated by racial animosity, just like the actions of the defendant RPD officers in this case was motivated by racial animosity.

141.　　The body camera footage of the incident showed that RPD officers Spenser McAvoy and Michael Sippel wrestled Pate to the ground and TASED.

142.　　Another piece of video shows McAvoy, say: "That's why I was asking for your ID but then when you want to be a smart a** then we're going to ding you for crossing the road illegally. That's it." He then goes on to say, "He's freaking so stupid. Everybody wants to think that the white cops are always after the black guy. Well, you [Pate] look like a guy on a wanted board."

143.　　In fact, Pate looks nothing like the man on the wanted board, James Barrett, other than that they were both black men.

144.　　On August 28, 2018, Mayor Lovely Warren and RPD Chief Michael Ciminelli held a press conference to announce that they had suspended officers Spenser McAvoy and Michael Sippel, for their unlawful stop, false arrest, assault, battery and use of excessive force against Pate during the May 5, 2018 incident.

145.　　Notably, just like the instant case, Mayor Warren and the RPD Chief did not hold their press conference until after Pate's attorney filed the Notice of Claim, informing the City that they intended to file a lawsuit, and after community activists held a press conference regarding the incident and demanding justice for Mr. Pate.

146.     Mayor Warren and Chief Ciminelli further announced that they would be seeking to terminate McAvoy and Sippel's employment with the City and RPD, and that the incident had been referred to the Monroe County District Attorney's Office ("District Attorney's office") for criminal prosecution.

147.     Mayor Warren and Chief Ciminelli stated that video of the incident recorded by McAvoy and/or Sippel's Body-Worn Camera(s) was the key evidence underlying their decision to seek termination of their employment and to refer the incident to the District Attorney for possible criminal prosecution of the officers.

148.     Mayor Warren stated that she had viewed the Body Worn Camera recording of the incident, and that "what [she] saw not only angered [her] and troubled [her], but hurt [her] in [her] heart."

149.     Chief Ciminelli stated that the recordings from McAvoy and/or Sippel's Body-Worn Camera(s) demonstrated that, "[t]his arrest should not have been made in the first place, and that triggered a sequence of events that is frankly outrageous."

150.     The "outrageous" events include the officers falsely arresting Mr. Pate after when the objective facts known to the officers unequivocally demonstrated they lacked reasonable or probable cause to believe he had committed any criminal act or violation; TASERing him, placing handcuffs upon his wrists, and then repeatedly striking him in the face after he was handcuffed, causing occipital bone and jaw fractures, as well as other injuries to his mouth; and making racist remarks and comments to and about Mr. Pate.

151.     After he was arrested, McAvoy and Sippel were recorded on their body worn cameras making disgusting, racist comments.

152.     Mayor Warren stated that since police officers hold positions of authority and wield a lot of power over citizens in the City of Rochester, there is a heightened obligation to ensure that Police Officers are held accountable when they commit misconduct and/or violate the constitutional rights of the City's citizens.

153.     Mayor Warren's words ring hollow to the family of Mr. Prude and the Rochester community, who see that the City and the RPD covered up the facts surrounding Mr. Prude's murder by the defendant RPD officers for over five months.

154.     McAvoy and Sippel's excessive use of force, other unlawful actions, and racist comments towards Mr. Pate was a direct and proximate result of the longstanding, entrenched policies and customs of the City and the RPD of failing to discipline officers for using excessive force, even when said gross use of excessive force was captured on video.

155.     At the press conference, Mayor Warren stated that prior to Mr. Pate's incident, other RPD officers had been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of citizen complaints that officers used excessive force against them.

156.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of allegations that RPD officers used excessive force against them at any time during Mayor Warren's time in office as the Mayor of the City of Rochester.

157.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire as a result of the City and RPD's investigation of allegations that RPD officers used excessive force against them at any time since Chief Ciminelli's appointment as the Chief of the Rochester Police Department.

158.     Upon information and belief, no RPD officer has been suspended, fired, terminated, or forced to retire in the past ten years as a result of allegations that said officer used excessive force.

159.     In a July 2019 press conference, Chief SINGLETARY stated that the conduct of the officers on the video "is not reflective of the rest of the men and women who work for the Rochester Police Department."

160.     Chief SINGLETARY's statements also ring hollow this week, as he was responsible for covering up the murder of Daniel Prude by the defendant RPD officers, whose treatment of Mr. Prude was also disgusting and racist.

161.     In fact, Chief SINGLETARY's comments at the July 2019 press conference demonstrate that after the Pate incident, the City and RPD determined not to address the systemic, department-wide policies, practices and customs that led to Mr. Pate being subjected to excessive force by racist police officers in May 2018.

162.     The failure of the City and the RPD to address these underlying problems following the Pate incident, and instead using McAvoy and Sippel as scapegoats and claiming that they were simply "bad apples", was a direct and proximate cause of Mr. Prude's death.

163.     As stated by the decedent's brother, Joe Prude, the actions of the defendant RPD officers constituted a "modern day lynching."

164.     City of Rochester and the Rochester Police Department continue to employ bad, racist cops who use excessive force against residents of the City of Rochester—and disproportionately against Black residents.

**B. September 4, 2015 incident where Officers Jeffrey Kester, Matthew Drake and Steven Mitchell brutally beat David Vann while he was handcuffed and defenseless further shows that the City and the RPD have failed to address systemic problems of racism and excessive force.**

165.    On September 4, 2015, RPD Officers Jeffrey Kester, Matthew Drake and Steven Mitchell brutally beat David Vann for over two minutes while he was handcuffed and not resisting or fighting with officers. Jeffrey Kester attempted to throw Mr. Vann onto the ground after he was handcuffed, as Mitchell and Drake pushed him from behind, causing Mitchell, Drake and Vann to fall on top of Kester. As a result of the actions of Kester, Mitchell and Drake, Kester broke his leg—when Mitchell and Drake realized Kester was injured, they retaliated against Mr. Vann by brutally beating him for over two minutes, while he was handcuffed and defenseless.

166.    The incident took place outside of a convenience store known as A & Z Market, located at 439 South Avenue, Rochester, New York. The store had four properly working security cameras, which recorded the incident. The videos of the incident are hereby incorporated as if more fully pleaded herein, and can be viewed at the following URL: http://rochester.indymedia.org/node/147955.[8]

167.    Mitchell is a Defensive Tactic Instructor for the RPD, which involves training recruits in everything from handcuffing up through the escalation of force chart.

168.    Mitchell is also a Field Training Officer for the RPD, which involves hands-on training of new officers in the field after they graduate from the police academy.

---

[8] The videos can be viewed by scrolling to the bottom of the page and clicking on the "play" buttons. Plaintiff fully incorporates the surveillance videos posted at http://rochester.indymedia.org/node/147955 by reference as if each fact depicted in said video was fully pled at length herein. Plaintiff does not incorporate by reference any information on the article posted at http://rochester.indymedia.org/node/147955 or any other information posted at that specific URL, or on the "rochester.indymedia" website.

169.    As both the Defensive Tactics Instructor and a Field Training Officer for the RPD, Mitchell is a municipal policymaker with respect to the RPD's use of force policies and training.

170.    Mitchell use of force against Mr. Vann while he was handcuffed, helpless, and not fighting, resisting or struggling with the officers in any way, was both grossly excessive under clearly established law and criminal.

171.    Following this incident, Mitchell was not disciplined in any way.

172.    The City and RPD should have disciplined Mitchell because the video evidence clearly demonstrated his use of force against Mr. Vann was grossly excessive and criminal.

173.    Further, the City and RPD should have disciplined Mitchell because he falsely claimed in sworn police paperwork falsely charging Mr. Vann with two counts of felony assault on a police officer and in his testimony at the grand jury and at Mr. Vann's criminal trial that he and Kester could not secure handcuffs upon Mr. Vann's wrists—which was contradicted by the surveillance video.

174.    Following this incident, Mitchell continued to be employed as Defensive Tactic Instructor and Field Training Officer for the RPD.

175.    As a Defensive Tactic Instructor and Field Training Officer for the RPD, Mitchell leads by example and teaches recruits and new officers how to make arrests, secure handcuffs onto an arrestee's wrists, and when it is appropriate to use force against arrestees and how much force may be used in different situations.

176.    Mitchell also teaches recruits and new officers how to complete their paperwork to document the reasons for making an arrest and using force against an arrestee.

177.   By failing to discipline Mitchell and instead continuing to employ him as Defensive Tactic Instructor, the City and the RPD ratified his unlawful use of force aginst Mr. Vann as a municipal policy, practice or custom.

178.   Specifically, by failing to discipline Mitchell and instead continuing to employ him as Defensive Tactic Instructor and Field Training Officer, the City and the RPD ratified the following conduct as permissible by RPD officers:

   a.   Body-slamming a handcuffed, compliant, non-resisting arrestee onto the ground;

   b.   Repeatedly punching a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground, and does not pose a threat of physical harm to the officer or others;

   c.   Pepper spraying a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground;

   d.   Pepper spraying a handcuffed, compliant, non-resisting arrestee directly in the face from less than six inches;

   e.   Fabricating the officers' accounts of their interaction with said arrestee in official RPD paperwork such as investigatory reports;

   f.   Falsely swearing to the veracity of charging documents that falsely accuse arrestees of committing criminal acts, and forwarding said documents to prosecutors to initiate the malicious prosecution of said arrestees;

   g.   Testifying falsely at grand jury proceedings;

   h.   Testifying falsely at petit jury proceedings; and

   i.   Signing false statements and testifying falsely despite knowing that objective video evidence contradicts said false statements and testimony.

179.   The City and the RPD also failed to discipline Kester or Drake for their false arrest or use of excessive force against Mr. Vann; for signing false felony complaints; or for testifying falsely in front of the grand jury and petit jury.

180.    By failing to discipline Drake and Kester, the City and the RPD ratified their conduct as a municipal policy, practice or custom.

181.    The Defendant CITY and the RPD failed to conduct any internal investigation into Michell, Drake and Kester's use of force and/or failure to intervene to stop and or prevent the unlawful use of force against Mr. Vann, to determine if their conduct was unlawful, excessive or in violation of RPD policies.

182.    The defendant CITY and the RPD knew or should have known that they needed to investigate the Michell, Drake and Kester's use of force and/or failure to intervene to stop and or prevent the unlawful use of force against Mr. Vann on September 4, 2015, because Michell, Drake and Kester's all admit to using force against Mr. Vann in their subject resistance reports; because Mr. Vann was acquitted by the jury; and because the security camera video recovered from the store on the night of the incident clearly demonstrates that the officers fabricated their account of their interaction with Mr. Vann in their arrest and charging paperwork, and testified falsely at the grand jury and petit jury.

**C. May 1, 2013 incident where Officers Joseph M Ferrigno II and Anthony R. Liberatore brutally beat Benny Warr, a disabled man in a wheelchair, further shows the department-wide problems of racism and deliberate indifference to officers' use of excessive force.**

183.    On May 1, 2013, RPD Officers Joseph M Ferrigno II and Anthony R. Liberatore were recorded by RPD Blue Light Cameras[9] and witnesses cell phone cameras[10] brutally beating Benny Warr, a 52-year-old African American man and wheelchair-bound amputee, while he was

---

[9] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

[10] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

waiting for a RTS bus at the intersection of Jefferson and Bartlett Streets.[11] As reported by the Democrat & Chronicle, Mr. Warr testified to the RPD's Professional Standards Section "that he was maced, thrown to the ground and struck after he responded to an order to move by telling officers that he was just waiting for a bus."[12] Mr. Warr's PSS testimony was corroborated by witness' cell phone[13] videos and RPD Blue Light Camera video.[14]

184.    The PSS investigation found that Officer Libertore utilized an elbow strike to Benny Warr's head while Mr. Warr was lying face down on the ground, and determined that the elbow strike was an untrained technique under RPD standards.

185.    The PSS investigation also found that before Officer Libertore utilized the untrained elbow strike to Mr. Warr's head, he stated to Mr. Warr, "are you ready to get your ass kicked."

186.    Officer Libertore testified to PSS that:

> He knew that he was under arrest. The only way he was going to leave was in an ambulance, meaning that we were definitely going to have to get physical and that either he was going to have to be hurt, or one of us were going to be hurt.

187.    Any reasonable person reviewing the PSS findings, Officer Ferrigno's PSS testimony, and the videos of Officers Ferrigno and Libertore pepper-spraying Benny Warr, pushing his wheel chair over, and repeatedly striking Mr. Warr in the head and body while Mr.

---

[11] *See* Complaint, *Warr, et al. v. City of Rochester, et al.*, 13-cv-6508-DLG-MWP (W.D.N.Y. Sept. 19, 2013). Complaint incorporated by reference herein.

[12] Erica Bryant, *Whatever happened to Benny Warr,* DEMOCRAT & CHRONICLE (Dec. 7, 2013), http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny-warr-/3895715/ (last visited Apr. 10, 2016). Article incorporated by reference herein.

[13] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

[14] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

Warr was lying face down on the ground could only describe the force used by Officers Ferrigno and Libertore as objectively unreasonable and excessive.

188.    Nevertheless, the PSS and CRB each recommended to the RPD Chief of Police James Sheppard that Officers Ferrigno and Libertore be exonerated on Benny Warr's allegation that the officers used excessive force while effectuating his arrest.

189.    According to the CRB, its main focus "is to determine the fairness, thoroughness and timeliness of the police complaint investigation as well as any possible deficiencies."[15] Moreover, the CRB prides itself in "providing independent, neutral fair representation for all involved parties."[16]

190.    However, in the CRB review of Benny Warr's excessive force complaint, the CRB panelists accused the RPD of attempting to inappropriately influence their investigation. Specifically, the CRB panelists objected to the fact that Sergeant Andrew McPherson, one of the RPD's Defensive Tactics Coordinators, made a presentation to the CRB explaining the purported reasons the PSS exonerated Officers Ferrigno and Libertore, despite the overwhelming video and testimonial evidence showing they used excessive force in effectuating the arrest of Benny Warr.

191.    Former RPD Chief of Police James Sheppard reviewed the PSS and CRB investigative findings, and the witness cell phone and RPD Blue Light Camera videos of the incident, and decided to exonerate both officers on Mr. Warr's excessive force allegations, because he believed their use of force was reasonable under the circumstances.

---

[15] *Police Community Relations Program: Civilian Review Board 2015 Annual Report* at 15, available at http://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=8589964676 (last visited Apr. 17, 2016) (Hereinafter "2015 CRB Report"). 2015 CRB Report incorporated by reference herein.
[16] *Id*. at 3.

192.    Former Chief Sheppard was a municipal policymaker for the defendant City, and his decision not to discipline Ferrigno and Libertore constituted a ratification of their unlawful use of force.

193.    Sheppard's decision not to discipline Ferrigno and Libertore constituted an official policy of the City and the RPD that RPD officers will not be disciplined for using excessive force, even if their grossly excessive use of force is captured on video.

194.    The Defendant City has admitted that the CRB and its use-of-force review procedures are constitutionally deficient, as the City has begun the process to overhaul its civilian review process.[17]

195.    The proliferation of video evidence capturing police misconduct has led to an increase in the number and percentage of substantiated complaints of police misconduct in municipalities across the county. For example, in New York City, the number of complaints substantiated by the NYPD's Civilian Complaint Review Board ("CCRB") increased approximately seventy-percent (70%) from 2014 to 2015.[18] In fact, forty-three percent (43%) of cases where video evidence was available were substantiated by the CCRB in 2015, as opposed to thirty-percent (30%) of cases substantiated overall.[19]

---

[17] Sharpe, Brian, *City Council seeks outside study of police civilian review process*, DEMOCRAT & CHRONICLE (June 3, 2017). http://www.democratandchronicle.com/story/news/2017/06/03/council-begins-review-bryant-case-seeks-outside-study-civilian-review-board/365336001/. Article incorporated by reference herein.

[18] John Annese and Graham Rayman, *Review Board substantiates 30% of civilian complaints against NYPD officers in December with video evidence*, N.Y. Daily News (Jan. 15, 2016), http://www.nydailynews.com/new-york/30-civilian-complaints-nypd-substantiated-article-1.2497121 (last visited Apr. 10, 2016). Article incorporated herein by reference.

[19] *Id.*

196.    Nevertheless, Defendant CITY and the RPD persist in their failure to discipline RPD Officers who use force without justification, even when presented with irrefutable video evidence that said use of force was unjustified and excessive.[20]

### THE DEFENDANT CITY AND RPD'S DELIBERATE INDIFFERENCE IS EVIDENCED BY THE FAILURE DISCIPLINE OFFICERS WHO HAVE REPEATEDLY USED EXCESSIVE FORCE—EVEN WHEN SAID FORCE IS CAPTURED ON VIDEO

197.    The Defendant CITY and the RPD have been on notice of the widespread practice of officers' use excessive force since at least 1992, when former RPD Chief Gordon F. Urlacher pleaded guilty to a felony conspiracy charge that he knew about civil rights abuses of five RPD officers, including the repeated use of excessive force, but deliberately failed to discipline the officers for their unlawful actions.[21]

198.    In recent years, with the proliferation of cell phone cameras, numerous excessive force incidents have been captured on video; nevertheless, even when clear video evidence demonstrates that an officer's use of force was unlawful and excessive, the City and the RPD refuse to discipline said officers.

199.    By failing to discipline officers in the first instance, said officers are encouraged to repeat their use of excessive force against subsequent individuals. The below examples constitute just a small fraction of the officers who have repeatedly used excessive force but have not been disciplined, even when the force incident was captured on video.

---

[20] *See generally*, Barbara Lacker-Ware and Theodore Forsyth, *The Case for an Independent Police Accountability System: Transforming the Civilian Review Process in Rochester, New York* (2017). Available online at: http://enoughisenough.rocus.org/wp-content/uploads/2017/02/The-Case-for-an-Independent-Police-Accountability-System-2.1.17-FINAL.pdf. Report incorporated by reference herein.
[21] *Civil Rights Trial Is Likely to Leave a Long-Term Mark on Rochester Police*, N.Y. Times (Apr. 6, 1993), http://www.nytimes.com/1993/04/06/nyregion/civil-rights-trial-is-likely-to-leave-a-long-term-mark-on-rochester-police.html (last visited June 7, 2016). Article incorporated by reference herein.

## RPD OFFICER PATRICK GIANCORSO AND HIS PARTNER WILLIAM WAGNER

200.    Patrick Giancursio has used excessive force against numerous individuals in the City of Rochester both before and after the incident complained of herein, but has never been disciplined by the Defendant CITY or the RPD.

201.    Instead, Giancursio has been rewarded by the Defendant CITY and the RPD for his repeated unlawful use of force against various arrestees.

202.    For example, the RPD awarded Giancursio its "Officer of the Year Award" in May 2017, even though he was suspended at the time of the award while the department allegedly investigated his use of force against Alexander Grassies in an April 2017 incident that was caught on surveillance video.[22]

203.    Giancursio was also caught on surveillance video using excessive force against Brian Norford in the area of 475 Lyell Avenue, Rochester, New York, on February 3, 2016, when Giancursio drove his RPD vehicle onto a sidewalk to purposefully strike Mr. Norford, who was knocked to the ground. After knocking Mr. Norford to the ground with his police cruiser, Giancursio exited the vehicle and struck him several times along with his partner, William Wagner.[23]

204.    Despite Giancursio being captured on video using grossly excessive amount of force at least two times between February 2016 and April 2017, and the fact that he was

---

[22] Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy. Article incorporated by reference herein.
[23] Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a-norford-files-7-million-civil-suit-against-rochester-police/87382790/. Article incorporated by reference herein.

suspended pending the department's investigation into his use of force against Mr. Garries in the April 2017 incident, the RPD still chose to honor Giancursio by awarding him its "Officer of the Year Award."

205.    Despite Giancursio's unlawful actions against Mr. Norford being captured on video, costing the City tens of thousands of dollars to settle Ms. Norford's civil claims, and garnering widespread media attention, the Defendant CITY and the RPD never conducted an independent investigation into Giancursio's use of force against Mr. Norford to determine if it was unlawful, excessive or in violation of RPD policies.

206.    In fact, Giancursio's use of force against Mr. Norford was unlawful, excessive and violated the RPD's policies.

207.    Nevertheless, the Defendant CITY and RPD never disciplined Giancursio following the February 3, 2016 where he, *inter alia*, falsely arrested and used excessive force against Mr. Norford.

208.    Moreover, despite Giancursio's unlawful actions against Mr. Garries being captured on video and garnering widespread media attention, the Defendant CITY and the RPD failed to conduct an independent, full, and fair investigation into Defendant Giancursio's use of force against Mr. Garries to determine if it was unlawful, excessive or in violation of RPD policies.

209.    In fact, Giancursio's use of force against Mr. Norford and Mr. Garries was unlawful, excessive and violated the RPD's policies.

210.    Nevertheless, the Defendant CITY and RPD eventually exonerated Giancursio and failed to impose any meaningful discipline against him following the April 2017 incident where he was captured on video using excessive force against Mr. Garries.

211.    Notably, Giancorso's partner, Wagner, was present with Giancorso throughout the February 3, 2016 incident with Mr. Norford and the April 2017 incident with Mr. Garries, and he both used excessive force against Mr. Norford and Mr Garries, and he failed to intervene to prevent Giancorso's use of excessive force against Mr. Norford and Mr. Garries, despite having had the opportunity to do so.

212.    Moreover, Despite Giancursio's unlawful actions against Mr. Garries being captured on video and garnering widespread media attention, the Defendant CITY and the RPD failed to conduct an independent, full, and fair investigation into Defendant Giancursio's use of force against Mr. Garries to determine if it was unlawful, excessive or in violation of RPD policies.

213.    Instead, Defendant CITY and the RPD accepted Giancursio and Wagner's justification for the use of force at face value.[24]

214.    In fact, in speaking about the suspensions of GIANCURSIO and WAGNER as a result of the incident involving Mr. Garries, RPD Chief Michael Ciminelli stated, "[w]e need to understand the justification for the use of force. Whenever an officer uses force, that officer has an obligation to articulate the justification for the force … why it was done, how it was done, did it follow our training, our policies."[25]

215.    Chief Ciminelli admits that an officers' subjective justification for the use-of-force is more important than objective evidence demonstrating whether said use of force was actually excessive and unlawful.

---

[24] 2 Rochester police officers suspended over incident on video, Democrat & Chronicle (Apr. 20, 2017) https://www.usatoday.com/story/news/2017/04/20/2-rochester-police-officers-suspended/100703474/. Article incorporated by reference herein.
[25] *Id.*

- 44 -

216.     The Defendant CITY and RPD eventually exonerated Giancursio and failed to impose any meaningful discipline against Giancursio following the April 2017 incident where he was captured on video using excessive force against Mr. Garries.

217.     Chief Ciminelli is a municipal policymaker for the defendant City, and his decision not to discipline Giancursio constituted a ratification of his unlawful use of force.

218.     Chief Ciminelli's decision not to discipline Giancursio, and instead allowing him to be awarded the "Officer of the Year Award" in May 2017, constituted a continuation of the official policy of the City and the RPD that RPD officers will not be disciplined for using excessive force, even if their grossly excessive use of force is captured on video, which was previously established by former Chief Sheppard by his decision not to discipline Officers Ferrigno and Libertore.

## RPD OFFICER THOMAS RODRIGUEZ

219.     RPD Officer Thomas Rodriguez has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or the RPD.

220.     On August 31, 2002, RPD officer Thomas Rodriguez and other RPD Officers attacked Lawrence Rogers at 375 Driving Park Avenue, Rochester, New York, by tacking him to the ground, TASERing him, punching, kicking, and beating him with night sticks. Upon information and belief, the excessive force used against Mr. Rogers by RPD officer Thomas Rodriguez and other RPD Officers, caused his death.

221.     RPD Officer Thomas Rodriguez was never disciplined by the Defendant City or the RPD following the incident on August 31, 2002 that caused Mr. Rogers' death.

222.    Thereafter, on May 10, 2007, RPD officer Thomas Rodriguez used excessive force against Ann Marie Sanders, a 100-pound woman, during an incident, where he grabbed her by the arms, body slammed her into the ground, put his knee in her back, handcuffed her, threw her into the back of a police vehicle, and threatened to mace her.

223.    RPD Officer Thomas Rodriguez was never disciplined by the Defendant City or the RPD following the May 10, 2007 incident with Ann Marie Sanders.

224.    On August 7, 2016, RPD Officer Thomas Rodriguez, was involved in the brutal beating of 17-year-old Ricky Bryant, wherein Mr. Bryant was shot with "pepper balls," punched in the face, thrown to the ground, sprayed him in the face with mace, and shot with a TASER.

225.    As a result of the brutal beating at the hands of P.O. Rodriguez and other RPD Officers, Mr. Bryant suffered serious physical injuries, including a fractured orbital socket.

226.    Mr. Bryant filed a complaint of excessive force against P.O. Rodriguez and other RPD Officers who brutally beat him with the Civilian Review Board.

227.    The Civilian Review Board and the RPD exonerated P.O. Rodriguez and the other officers involved in the brutal beating of Mr. Bryant.

228.    After the Civilian Review Board and the RPD exonerated P.O. Rodriguez and the other RPD Officers involved in the brutal beating of Mr. Bryant, the Rochester City Counsel, for the first time ever, issued subpoenas for records related to the incident.

229.    The direct and proximate cause of P.O. Rodriguez's utilization of the illegal and excessive amount of force used against Mr. Bryant, resulting in a fractured orbital socket, was the Defendant CITY and the RPD's failure to discipline P.O. Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, and other individuals in the City of Rochester.

230.     Despite P.O. Rodriguez's unlawful actions garnering national media attention, the Defendant CITY and the RPD have not conducted a full, thorough, fair and independent investigation into P.O. Rodriguez's use of force against Mr. Bryant, to determine if it was unlawful, excessive or in violation of RPD policies.

231.     Defendant CITY and RPD never disciplined P.O. Rodriguez following the August 7, 2016 incident where he, *inter alia*, brutally beat 17-year-old Ricky Bryant and fractured his orbital socket.

232.     In April 2017, RPD Officer Thomas Rodriguez placed DKuan Webb in an illegal chokehold in an incident that was recorded on P.O. Rodriguez's body camera.

233.     P.O. Rodriguez's illegal chokehold of Mr. Webb was investigated by the Federal Bureau of Investigation, according to the Democrat & Chronicle.[26]

234.     In mid-July 2017, the Defendant CITY agreed to pay Mr. Webb $125,000 to settle any potential civil claims arising from the violation of Mr. Webb's rights under the United States Constitution and the common laws of the State of New York.

235.     The direct and proximate cause of P.O. Rodriguez's utilization of the illegal chokehold against Mr. Webb was the Defendant CITY and the RPD's failure to discipline P.O. Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, Mr. Bryant and other individuals in the City of Rochester.

236.     Despite P.O. Rodriguez's unlawful actions being captured on video, costing the City $125,000 to settle Mr. Webb's civil claims, drawing an FBI investigation into P.O. Rodriguez for possible federal criminal and or civil rights violations, and garnering national

---

[26] Gary Craig, *City pays $125,000 to man allegedly choked by RPD police officer*, DEMOCRAT & CHRONICLE (Sept. 5, 2017), http://www.democratandchronicle.com/story/news/2017/09/05/city-rochester-police-choking-fbi-settlement-dkuan-webb-thomas-rodriguez-john-parrinello/632147001/. Article incorporated by reference herein.

media attention, the Defendant CITY and the RPD have not conducted an independent investigation into P.O. Rodriguez's use of force against Mr. Webb to determine if it was unlawful, excessive or in violation of RPD policies.

237.    Defendant CITY and RPD never disciplined P.O. Rodriguez following the April 2017 incident where he, *inter alia*, utilized an illegal chokehold against DKuan Webb.

### RPD OFFICER ALEXANDER BALDAUF (and his partner Ricky Harris Jr.)

238.    RPD Officer Alexander Baldauf has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant City or the RPD.

239.    On August 17, 2013, RPD Officer Alexander Baldauf and attacked Dwayne Ivery in Rochester, New York, punching Mr. Ivery in the head numerous times, slamming his body onto the ground, again punching Mr. Ivery in the head and body, and stomping on Mr. Ivery's head with his foot. This incident was captured on video.

240.    Throughout the incident, upon information and belief, Officer Baldauf's partner, Ricky Harris Jr., stood idly nearby and failed to intervene to prevent or stop Officer Baldauf's violation of Mr. Ivery's rights, despite having the time and realistic opportunity to do so.

241.    Despite this interaction being caught on video, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officers Alexander Baldauf and Ricky Harris Jr. against Mr. Ivery to determine if it was unlawful, excessive or in violation of RPD policies.

242.    RPD Officers Alexander Baldauf and Ricky Harris Jr. were never disciplined by the City or the RPD following the incident on with Mr. Ivery on or about August 17, 2013.

243.     Thereafter, on April 20, 2015, RPD Officer Alexander Baldauf used excessive force against Delmar Lipford during an incident at or near the intersection of Culver Road and East Main Street, Rochester, New York. Officer Baldauf shoved Mr. Lipford in the back several times, punched him in the face, and pointed his TASER at Mr. Lipford.

244.     Throughout the incident on April 20, 2015, Officer Baldauf's partner, Ricky Harris Jr., stood idly nearby and failed to intervene to prevent or stop Officer Baldauf's violation of Mr. Lipford's rights, despite having the time and realistic opportunity to do so.

245.     RPD Officers Alexander Baldauf and Ricky Harris Jr. were never disciplined by the Defendant City or the RPD following the incident with Mr. Lipford on April 20, 2015.

### RPD OFFICER JOSEPH FERRIGNO II

246.     RPD Officer Joseph Ferrigno II has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD.

247.     Officer Ferrigno has been the subject of at least 23 civilian complaints of misconduct reviewed by the RPD's Professional Standards Section ("PSS"), many of which involved allegations of excessive force; however, Officer Ferrigno has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant City or the RPD.

248.     On or about September 12, 2010, RPD Officer Joseph Ferrigno II used excessive force against the Robin Turner during an incident where she called 911 to report that she'd been assaulted by a teenager in her neighborhood; Officer Ferrigno responded and refused to file a police report, and when Ms. Turner complained about Officer Ferrigno's actions, he retaliated against Ms. Turner by body slamming her onto the ground, dragging her across the ground

approximately 10 feet, and arresting her; as a result of the excessive force used by Officer Ferrigno, Ms. Turner suffered a broken rib.

249.    Despite Ms. Turner filing a complaint about the excessive amount of force used against her during her arrest, upon information and belief, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officer Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

250.    Officer Ferrigno was never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the September 12, 2010 incident where he used excessive force against Ms. Turner.

251.    On or about May 11, 2012, RPD Officer Joseph Ferrigno II used excessive force against Darren Williams during an incident where Officer Ferrigno hit Mr. Williams in the face while he was sitting down, threw him on the ground, punched and kicked him in his body and head, and stating to the plaintiff, "nigger, I'm going to teach you to respect authority."

252.    Despite Mr. Williams filing a complaint about the excessive amount of force used against him during his arrest, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officer Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

253.    Officer Ferrigno was never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the May 11, 2012 incident where he used excessive force and racial slurs against Mr. Williams.

254.    On May 1, 2013, RPD Officer Joseph M Ferrigno II and his partner, Anthony R. Liberatore, brutally beat and falsely arrested Benny Warr, a 52-year-old African American wheelchair-bound amputee, while he was waiting for a RTS bus at the intersection of Jefferson

and Bartlett Streets. As reported by the Democrat & Chronicle, Mr. Warr testified to the RPD's

Professional Standards Section "that he was maced, thrown to the ground and struck after he

responded to an order to move by telling officers that he was just waiting for a bus."[27] The

incident between Mr. Warr and RPD Officers Ferrigno and Liberatore was caught on video by

several bystanders[28] and the RPD's Blue Light Cameras.[29]

255.    RPD Officers Ferrigno and Libertore were never reprimanded, suspended,

retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD

following the May 1, 2013 incident where they brutally beat Benny Warr.


### RPD OFFICER MARIO MASIC

256.    RPD Officer Mario Masic has used excessive force against numerous individuals

in the City of Rochester both before and after the incident complained of herein, but has never

been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the

Defendant CITY or the RPD.

257.    Citizens of Rochester who were repeatedly harassed, assaulted and subjected to

excessive force by Masic sarcastically nicknamed him the "Cowboy" because of his wild and

lawless tactics. However, upon information and belief, Masic has embraced the nickname, and is

notorious for referring to himself as "The Cowboy" during interactions with citizens in

Rochester.

---

[27] Erica Bryant, *Whatever happened to Benny Warr,* DEMOCRAT & CHRONICLE (Dec. 7, 2013),
http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny-
warr-/3895715/ (last visited Apr. 10, 2016). Article incorporated by reference herein.
[28] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on
May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr
Being Attacked,* https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016).
Video incorporated by reference herein.
[29] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr
attack,* https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by
reference herein.

258.    MASIC has used excessive force against other arrestees after the date of the incident complained of herein, including the use of force without justification against arrestees while they were handcuffed.

259.    MASIC has never reprimanded, suspended, retrained on the use of force, retrained on the duty to intervene to prevent and/or stop unlawful actions of his fellow police officers, or been otherwise disciplined by the Defendant City or the RPD following the incident(s) that occurred either before or after the incident complained of herein.

260.    On August 7, 2009, MASIC unlawfully stopped, searched, arrested and used excessive force against a young man named Deshawn Keon Fields. MASIC thereafter falsified his police paperwork in an attempt to justify the reasons that he stopped and arrested Mr. Fields, and then forwarded that falsified paperwork to the Monroe County District Attorney's Office. Thereafter, MASIC perjured himself in front of the grand jury by tailoring his testimony in an attempt to nullify constitutional deficiencies in his arrest paperwork.

261.    Thereafter, in *People* v. *Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Honorable Joseph D. Valentino granted the criminal defendant's motion to suppress because forensic evidence showed that MASIC had testified untruthfully before the grand jury to nullify constitutional deficiencies in his arrest paperwork and justify the initial unlawful stop and search of Mr. Fields. Judge Valentino also found Masic's testimony at the suppression hearing to be incredible and unbelievable.

262.    Masic violated NY CPL § 140.05 and RPD internal rules and regulations when he fabricated his arrest and charging paperwork in *Fields*.

263.    Masic violated RPD internal rules and regulations when he lied under oath to the Grand Jury and at the suppression hearing in *Fields*.

264.    After Judge Valentino granted the criminal defendant's motion to suppress in *Fields* based on his finding that Masic had lied in his arrest and charging paperwork and perjured himself on the stand, the Defendant CITY and the RPD failed to discipline Masic.

265.    By failing to discipline MASIC after his unlawful actions in Fields, the Defendant CITY and the RPD condoned his unlawful conduct, causing him to violate the rights of subsequent individuals.

266.    On May 12, 2011, Masic unlawfully entered the property of a woman named Emily Good, and assaulted, battered and falsely arrested Ms. Good in retaliation for her lawfully filming Masic while he conducted vehicle search of an African American motorist who Masic had stopped directly in front of Ms. Good's home. Ms. Good filmed the encounter from her front yard, and when Ms. Good refused Officer Masic's request to stop filming, Officer Masic entered her front yard, grabbed her phone from her hand, threw her to the ground, arrested her and charged her with Disorderly Conduct, Obstruction of Governmental Administration and Resisting Arrest.

267.    Masic falsified his official arrest paperwork in an attempt to justify his unlawful arrest and use of force against Ms. Good, which he then forwarded to prosecutors to initiate her prosecution.

268.    All of the false criminal charges Masic initiated against Ms. Good were dismissed less than a week after Masic falsely arrested her.

269.    Ms. Good filed a Notice of Claim against the Defendant CITY following the May 12, 2011 incident where Masic, *inter alia*, falsely arrested and used excessive force against Ms. Good.

270. Defendant CITY offered settled Ms. Good's claim in exchange for her agreeing to forgo filing a civil rights lawsuit against the Defendant CITY and Masic related to the incident on May 12, 2011.

271. Despite this interaction being caught on video and garnering national media attention, the Defendant CITY and the RPD never conducted an independent investigation of the use of force Masic against Mr. Good to determine if it was unlawful, excessive or in violation of RPD policies.

272. The Defendant CITY and RPD never reprimanded, suspended, retrained, or otherwise disciplined Masic following the May 12, 2011 incident where he, *inter alia*, falsely arrested and used excessive force against Emily Good.

273. Thereafter, on September 18, 2015, Officer Masic arrested Quintin Keene in a laundromat on Genesee Street, Rochester, New York, and fabricated his arrest paperwork to falsely charge him with disorderly conduct, obstruction of governmental administration and resisting arrest. All the criminal charges were eventually dismissed. In the course of arresting Mr. Keene, Officer Masic pepper sprayed Mr. Keene, body-slammed him onto the ground, and told Mr. Keene if he did not stop moving he was going to be shot.

274. More details about Masic's misconduct in Mr. Keene's case are detailed in the Seventh Claim for Relief, supra.

275. Despite Masic admitting that he used force against Mr. Keene and all of the false criminal charges brought against Mr. Keene eventually being dismissed, Masic was never disciplined or reprimanded for his unlawful use of force against Mr. Keene.

**OTHER RECENT EXCESSIVE FORCE INCIDENTS CAPTURED ON VIDEO**

276.    On June 28, 2020, RPD Officers Nicholas Vandemar, Badge No. 2846, Jeremy

Lindauer, Badge No. 2363, and Brandon Contreras, Badge No. 2512, trespassed inside of the

home of a young man named Tobias Massey, where they assaulted, battered and falsely arrested

him in response to him lawfully recording the officers forcibly arrest and sit on the neck of a man

in the front yard of his home. They arrested Mr. Massey and charged him with Obstruction of

Governmental Administration and Resisting Arrest. RPD Chief La'Ron Singletary admitted that

based on the officers Body Worn Camera recordings and cell phone recordings of the incident,

the officers lacked any reason to arrest Mr. Massey, charge him with any crime, or use any force

against him.

277.    On July 5, 2020, at approximately 2:00 a.m., RPD officers responded to a house

on Pennsylvania Avenue in response in response to a 911 call that a 16-year-old boy was shot in

the face and needed medical assistance. When RPD officers arrived at the house, they

immediately assaulted and handcuffed two Black people who were comforting the boy and

tending to his wounds. Coincidentally, several local activists were sitting in the back yard of a

neighboring home when the police arrived. When Ms. Martin and her friends heard the boy yell

out, "we called you for help and now you're abusing us," they responded to the scene. When the

group of activists began recording the incident and demanding the release of the two individuals

who were handcuffed, the RPD retaliated against them by arresting four of the activists and

charging them with Obstruction of Governmental Administration.

278.    On September 15, 2016, RPD officers were captured on video falsely arresting Lentorya Parker and violently throwing her to the ground.[30] The officers involved were never disciplined.

279.    On August 27, 2013, RPD officers were captured on video assaulting a pregnant woman, Brenda Hardaway, punching her in the head and violently throwing her to the ground.[31] The officers involved were never disciplined.

280.    Often, RPD officers' unjustified use force is motivated by a desire to punish the arrestee for his or her perceived failure to display the degree of deference or subservience demanded by the arresting officers, and is unsupported by any objectively reasonable evidence. Often, the officer's racist beliefs also play a role in their perception that the arrestee has failed to comply with their demands and the officer's decision to use force without justification.

281.    Bad cops are the result of bad policy—and the City and the RPD have for decades maintained an unlawful municipal policy, practice and custom of failing to discipline officers who use excessive force and then fabricate their account of their interactions with said individuals in arrest and charging paperwork to bring one or more of a trinity of offenses as their favored cover charges: disorderly conduct, resisting arrest, and obstruction of governmental administration.

---

[30] Amy Hudak, *Body camera video released in Hollenbeck St. incident*, WHAM13 (Sept. 27, 2016), http://13wham.com/news/top-stories/body-camera-video-released-in-hollenbeck-st-incident; Amy Hudak, *Woman sues RPD, claiming excessive force in viral video*, WHAM13 (Sept. 6, 2017), http://13wham.com/news/local/woman-sues-rpd-claiming-excessive-force-in-viral-video. Articles and videos linked to therein are incorporated by reference hereto.
[31] Christine Carrie Fien, *Arrest video provokes outrage; chief responds*, CITY NEWSPAPER (Aug. 28, 2013), https://www.rochestercitynewspaper.com/rochester/arrest-video-provokes-outrage-chief-responds/Content?oid=2265099. Articles and videos linked to therein are incorporated by reference herein.

282.     RPD Officers often charge resisting arrest in conjunction with other charges when they are attempting to justify or conceal their unjustified use of force against the arrestee.

283.     The City and RPD's historic failure to discipline officers has created an entrenched culture within the RPD that condones and encourages officers to use excessive force as a matter of course, and to lie in official police paperwork and sworn testimony to justify their unlawful actions, as demonstrated by the incident involving Mr. Pate, and in the incident underlying the instant lawsuit, as detailed herein.

## THESE UNCONSTITUTIONAL POLICIES AND PRACTICES RESULTED IN PLAINTIFF'S INJURIES

284.     The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused decedent's constitutional rights to be violated as alleged herein.

285.     Upon information and belief, none of the Defendant RPD OFFICERS have ever previously been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD for any instance where they used force without justification, despite the Defendant CITY and the RPD knowing that each of the Defendant RPD OFFICERS have used force without justification on numerous occasions.

286.     The Defendant City and the RPD's practice of tolerating and condoning police misconduct by its officers, including but not limited to the Defendant RPD OFFICERS, directly and proximately resulted in decedent's death.

287.     The Defendant CITY and the RPD's policy, practice and custom of condoning the use of force without justification has caused countless individuals to be victimized by RPD Officers' repeated use of excessive force, including decedent.

288.     The chief policymaking officials who have condoned these unconstitutional policies and practices are Chief SINGLETARY and DCA SIMMONS, who have failed to institute a system to ensure that excessive force incidents are properly investigated and that bad officers are held accountable. They have also failed to institute proper training to ensure that RPD officers are aware of the constitutional limitations on the use of force. These failures by Chief SINGLETARY and DCA SIMMONS caused Mr. Prude's death.

289.     As a result of the above constitutionally impermissible conduct, decedent suffered violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, extreme physical pain, and death.

290.     Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

291.     Plaintiff also demands injunctive relief in the form of an Order directing the Defendant City and the RPD to implement a new system for investigating use-of-force incidents and disciplining officers that use force without justification.

292.     Because the Defendant City and RPD have persistently resisted calls for such reforms, Plaintiff demands that any injunctive relief ordered by the Court include independent oversight—such as a Federal Monitor.

293.     Because accountability begins with access to reliable data, any remedy must include mechanisms to ensure the accurate tracking of use-of-force incidents, lawsuits, misconduct complaints and internal probes. Compilation of this data is the only way to find

patters and effectively (1) root out bad officers, (2) amend or change RPD policy, and (3) identify issues that need to be addressed via additional training.[32]

294.    As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

295.    Defendants committed the foregoing violations of decedent's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to decedent's constitutional rights or to the effect of such misconduct upon decedent's constitutional rights.

296.    By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**SIXTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL***
**ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICES RELATING TO THE
DELIBERATE INDIFFERENCE OF THE CITY AND THE RPD TO THE RIGHTS OF
INDIVIDUALS SUFFERING FROM MENTAL ILLNESSES AND/OR EXPERIENCING
<u>ACUTE MENTAL HEALTH EPISODES</u>**
(Against the City)

297.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

298.    The Defendant City and the RPD maintain an unconstitutional policy, practice and custom of using excessive force against individuals suffering from mental illnesses, both chronic and acute.

299.    The defendant RPD officers knew or should have known that Mr. Prude was suffering from a mental health crisis when they were interacting with him on the night of the incident.

---

[32] *See, e.g.*, Long, Colleen, *NYPD tracking officer data on lawsuits, complaints*, AP (Jul. 15, 2011), http://www.policeone.com/officer-misconduct-internal-affairs/articles/8656321-NYPDtracking-officer-data-on-lawsuits-complaints. Article incorporated by reference herein.

300.    The RPD has a Crisis Intervention Team ("CIT") which is part of the Special Operations Division, headed by Defendant FAVOR. The CIT should have responded to this incident, but it was apparently never called.

301.    Instead, the defendant RPD officers, who lacked any training on how to properly interact with individuals suffering from acute and chronic mental heath conditions, responded to the incident.

302.    The failure of FAVOR to ensure that policies and procedures were in place to ensure that the CIT responded to incidents where individuals were suffering from acute mental health crises caused Mr. Prude's death.

303.    The City, RPD and FAVOR were deliberately indifferent to the fact that they had failed to implement any system to ensure that the CIT was notified and responded to incidents involving individuals suffering from mental health crises, despite knowing to a moral certainty that such failure caused individuals to be subjected to excessive force at much higher rates.

304.    The rates of excessive force used by untrained officers, like the defendant officers in this case, compared to specially trained CIT officers and Emotionally Disturbed Persons Response Teams has been long known to the City and the RPD, as detailed in the following training  document:  https://www.criminaljustice.ny.gov/opca/pdfs/33-EDPRT-CIT-Presentation-4-14.pdf.

305.    Defendant City and the RPD lack any rules, regulations or standards governing officers' interactions with individuals suffering from either chronic or acute mental illnesses. Instead, by failing to implement policies and practices to ensure that specially trained CIT offiers respond to mental health incidents, the City and the RPD have demonstrated that they are

deliberately indifferent to their officers use of excessive force against individuals suffering from mental health crises.

306.   Defendant City and the RPD does not provide any training, either at the police academy or in-service, regarding how to safely and lawfully interact with individuals suffering from either chronic or acute mental illnesses.

307.   The Defendant City knew or should have known that the requirements, guidelines, and terms of its training for the Defendant Police Officers were inadequate regarding interacting with individuals suffering from either chronic or acute mental illnesses., and to prevent the Defendant Police Officers from engaging in the wrongful conduct alleged herein.

308.   The Defendant City and the RPD has persistently failed to discipline officers who fail to comply with the laws, rules, regulations and standards governing officers' conduct during interactions with individuals suffering from either chronic or acute mental illnesses. Specifically, the City and the RPD have persistently failed to discipline officers who falsely arrest and/or use force without justification on individuals suffering from either chronic or acute mental illnesses.

309.   On September 4, 2015, RPD Officers Jeffrey Kester, Matthew Drake and Steven Mitchell brutally beat David Vann, as described infra. Kester, Drake and Mitchell knew or should have known that Mr. Vann was suffering from a mental health condition at the time they falsely arrested him and beat him for over two minutes after he was handcuffed and defenseless. Kester, Drake and Mitchell were never disciplined or retrained following their unlawful use of force against Mr. Vann.

310.   On July 15, 2001, RPD Officer Eliud Rodriguez falsely arrested and used excessive force against Edward S. Richards, who suffered from a chronic and/or acute mental illness. Just like this case, RPD Officer Eliud Rodriguez pepper sprayed Mr. Richards while he

was handcuffed, and stood idly by and failed to prevent or stop his partner from striking Mr. Richards multiple times while he was handcuffed.

311.    RPD Officer Rodriguez was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, or otherwise disciplined by the Defendant City or the RPD following the incident with Mr. Richards on July 15, 2001.

312.    Thereafter, on or about June 21, 2012, RPD Officer Eliud Rodriguez was one of seven RPD Officers who shot and killed Israel Andino. When Officer Rodriguez and other officers shot and killed Israel Andino, they knew that he was suffering from chronic and/or acute mental illnesses.

313.    RPD Officer Rodriguez was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, or otherwise disciplined by the Defendant City or the RPD following the shooting death of Israel Andino on June 21, 2012.

314.    On July 10, 2005, RPD Officer Mark Simmons responded to a 911 call that 13-year-old LaShedica Mason was suicidal and had locked herself in a room in her family's home on St. Jacob Street in Rochester. After Officer Simmons entered the home, the 13-year-old girl opened the door to the room and was holding a knife. Upon seeing the 13-year-old LaShedica holding a knife, Officer Simmons shot her three times, resulting in serious permanent injuries to LaShedica.

315.    RPD Officer Simmons was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, retrained on suicide intervention, or otherwise disciplined by the

Defendant City or the RPD following the July 10, 2015 incident where he shot LaShedica Mason—a suicidal 13-year-old girl—three times from close range.

316.    Instead, following the July 10, 2005 incident where he shot LaShedica Mason, Officer Simmons has received several promotions: first to Sergeant and Special Assistant to former Chief of Police James Sheppard; then to Lieutenant and commanding officer of the Professional Standards Section; and then recently to Deputy Chief of Administration.

317.    The Defendant City apparently admits that fails to train its officers on how to properly interact with individuals who are suffering from chronic and/or acute mental illnesses. Specifically, City of Rochester's official website states that the Rochester Police Department's Emotionally Disturbed Persons Response Team (EDPRT) is:

> [a] group of employees specially trained, on a *voluntary basis*, to deal with emotionally disturbed individuals in a variety of situations in the Rochester community. These situations may include suicidal persons, persons exhibiting irrational behavior, handling psychiatric patients, the homeless, various mental health concerns and/or referrals, and any other situations that deal specifically with the needs of the mental health community and emotionally disturbed persons.[33]

### THESE UNCONSTITUTIONAL POLICIES AND PRACTICES RESULTED IN PLAINTIFF'S INJURIES

318.    The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Mr. Prude's constitutional rights to be violated as alleged herein, and his death.

---

[33] *ROCHESTER POLICE DEPARTMENT SPECIAL OPERATIONS DIVISION*, CITY OF ROCHESTER, http://www.cityofrochester.gov/article.aspx?id=8589936531 (last visited June 7, 2017)(emphasis added).

319.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff Mr. Prude as alleged herein.

320.     Any reasonable and/or properly trained police officer would have understood that at the time of the incident on March 23, 2020, Mr. Prude was in the throes of an acute, psychotic episode and that he needed help.

321.     The Defendant Police Officers had never received any training during their employment by the Defendant City and the RPD on how to properly and lawfully interact with individuals suffering from chronic and/or acute mental illnesses.

322.     The Defendant City is deliberately indifferent to the fact that its police officers do not receive any training on how to properly and lawfully interact with individuals suffering from mental illnesses, and individuals experiencing acute mental health episodes. Despite being on notice that officers regularly and routinely interact with individuals suffering from chronic mental illnesses and individuals experiencing acute mental health episodes, and despite knowing that said lack of training had previously caused repeated violations of individuals' rights, the Defendant City and the RPD failed to take any remedial action.

323.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD constituted deliberate indifference to the safety, well-being and constitutional rights of the Mr. Prude, and caused his death.

324.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD were the moving force behind the constitutional violations suffered by Plaintiff Mr. Prude as alleged herein, and caused his death.

325.   As a result of the foregoing, Mr. Prude was caused to suffer personal injuries, violation of his civil rights, physical harm, pain, emotional distress, anguish, anxiety, fear, humiliation, and death.

326.   As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

327.   Defendants committed the foregoing violations of Mr. Prude's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct upon Plaintiffs constitutional rights.

328.   By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.


**WHEREFORE and in light of the foregoing**, Plaintiff respectfully requests that the Court assume jurisdiction and:

[a] Award appropriate compensatory and punitive damages.

[b] Award appropriate declaratory and injunctive relief, including appointing a federal monitor to oversee necessary reforms of the Defendant CITY's process for investigating incidents where RPD Officers use force, and implementing measures to ensure that officers who use force without justification are disciplined.

[c] Empanel a jury.

[d] Award attorney's fees and costs pursuant to 42 U.S.C. § 1988;

[e] Award such other and further relief as the Court deems to be in the interest of justice.

Dated: New York, New York      Respectfully Submitted,
      September 8, 2020

      ROTH & ROTH, LLP
      EASTON THOMPSON KASPEREK SHIFFRIN LLP

By:    _____~//s//~_____
    Elliot D. Shields
    Roth & Roth, LLP
    Co-Counsel for Plaintiff
    192 Lexington Avenue, Suite 802
    New York, New York 10016
    Tel: (212) 425 1020

    Donald M. Thompson
    Easton Thompson Kasperek Shiffrin LLP
    Co-Counsel for Plaintiff
    The Powers Building
    16 West Main Street, Suite 243
    Rochester, New York 14614
    Tel: (585) 423-8290

JS 44  (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Tameshay Prude, as administrator of the estate of Daniel Prude, deceased | City of Rochester, La'Ron Singletary, Mark L. Simmons, Henry C. Favor, Michael Perkowski, Mark Vaughn, Troy Taladay, Francisco Sati |

| (b)  County of Residence of First Listed Plaintiff    Cook Co., Il | County of Residence of First Listed Defendant    Monroe |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

(c)  Attorneys *(Firm Name, Address, and Telephone Number)*
Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 802, New York, New York 10016; 212-425-1020

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC Section 1983 (civil rights violations)

Brief description of cause:
Excessive force, causing death.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                   DOCKET NUMBER

DATE
09/08/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   The City of Rochester
30 Church Street
Room 400a
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____            _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    RANDY BENJAMIN
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> *Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   MICHAEL HOULIHAN
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   FLAMUR ZENELOVIC
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) |
| *Defendant(s)* | ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   JOSIAH HARRIS
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   PAUL RICOTTA
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                _____
                                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   ANDREW SPECKSGOOR
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

TAMESHAY PRUDE, as administrator of the estate
of DANIEL PRUDE, deceased,

_____
*Plaintiff(s)*

v.

THE CITY OF ROCHESTER, et al.,

_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  MICHAEL MAGRI
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  FRANCISCO SANTIAGO
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  TROY TALADAY
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased,<br><br>_____<br>*Plaintiff(s)*<br>v.<br>THE CITY OF ROCHESTER, et al.,<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   MARK VAUGHN
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Michael Perkowski
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                 *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| THE CITY OF ROCHESTER, et al., | ) ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*     Henry C. Favor
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> _____ <br> *Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*   Mark L. Simmons
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of New York

| | |
|---|---|
| TAMESHAY PRUDE, as administrator of the estate of DANIEL PRUDE, deceased, <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> THE CITY OF ROCHESTER, et al., <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  La'Ron Singletary
185 Exchange Blvd.
Rochester, New York 14614

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Elliot Shields, Roth & Roth LLP, 192 Lexington Avenue, Suite 192, New York, New York 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*