**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

NATHANIEL MCFARLAND, in his capacity as
supervised and ancillary administrator of the ESTATE
OF DANIEL PRUDE,

               Plaintiff,

               v.

THE CITY OF ROCHESTER, MARK VAUGHN,
TROY TALADAY, FRANCISCO SANTIAGO,
MICHAEL MAGRI, ANDREW SPECKSGOOR,
JOSIAH HARRIS, and other as-yet-unidentified
Rochester police officers.

               Defendants.

---

**SECOND**
**AMENDED COMPLAINT**
**(JURY TRIAL DEMANDED)**

No. 6:20-cv-006675-FPG

---

Plaintiff NATHANIEL MCFARLAND, in his capacity as supervised and ancillary administrator of the ESTATE OF DANIEL PRUDE, by his undersigned counsel, complains against defendants THE CITY OF ROCHESTER, MARK VAUGHN, TROY TALADAY, FRANCISCO SANTIAGO, MICHAEL MAGRI, ANDREW SPECKSGOOR, JOSIAH HARRIS, and other as-yet-unidentified Rochester police officers as follows:

### Introduction

1. On March 23, 2020, Daniel Prude, a 41-year-old Black man, suffered an acute mental health crisis in Rochester, New York. His family sought help from the Rochester police, and that was a mistake—a fatal mistake. Instead of providing him with care and assistance, officers of the Rochester Police Department cruelly abused him, mocked him, and killed him. For years before Daniel's death, Rochester has maintained a policy of deliberate indifference to the rights of people of color who encounter its police officers, in particular those people experiencing mental

health crises. As a result of the City's policy failures, people in Rochester have endured years of abuse, and vulnerable people like Daniel Prude have been killed.

## Jurisdiction and Venue

2.      This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of law, of Daniel Prude's rights as secured by the United States Constitution.

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## Parties

5.      Nathaniel McFarland is one of the five surviving children of Daniel Prude. On November 12, 2020, the Probate Division of the Circuit Court of Cook County, Illinois, appointed Mr. McFarland supervised administrator of the Estate of Daniel Prude, empowering him to prosecute this action. Plaintiff McFarland was also granted Ancillary Letters of Administration by the Monroe County Surrogate's Court on December 15, 2020.

6.      Defendant City of Rochester ("the City") is a municipal corporation created under the laws of the State of New York. The City is authorized by law to maintain a police department, which acts as the City's agent for law enforcement. It is located within the Western District of New York.

7.      Defendant Mark Vaughn is a Rochester police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police officer.

8.      Defendant Troy Taladay is a Rochester police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police officer.

9. Defendant Francisco Santiago is a Rochester police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police officer.

10. Defendant Josiah Harris is a Rochester police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police officer.

11. Defendant Andrew Specksgoor is a Rochester police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police officer.

12. Defendant Michael Magri is a police sergeant with the Rochester Police Department who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Rochester police sergeant.

13. Other as-yet-unidentified defendant officers who might have been present at the scene of Daniel Prude's fatal encounter with the police were, at all times relevant to his action, acting under color of law and within the scope of their employment as Rochester police officers.

**Joe Prude Seeks Help For His Brother Daniel, Who Is Having A Mental Health Crisis**

14. On March 22, 2020, Daniel had recently arrived in Rochester for a visit with his brother, Rochester resident Joe Prude, and had been behaving erratically.

15. Within a few hours of his arrival, Daniel made suicidal statements and threw himself head-first down a flight of stairs in Joe's home. Joe's wife called 911 for help getting her brother-in-law to the hospital.

16.     In response to the 911 call, Rochester Police Officers arrived at Joe's home just after 7:00 p.m. and found Daniel and Joe sitting at the kitchen table. Daniel was praying and pleading for help.

17.     Daniel fully complied with the officers' instructions and allowed them to put him in handcuffs. Daniel then kneeled and sat on the floor, crying and praying, while the officers collected information from Joe. At the officers' request, Daniel stood up and fully cooperated as the officers escorted him out of the house and into the ambulance.

18.     Daniel was admitted to the hospital, and after a brief period of hospitalization, Daniel was discharged and returned to his brother's home around 11:00 p.m. Daniel appeared calmer than when he left and stayed awake talking with his brother Joe until just before 3:00 a.m. on March 23, when suddenly Daniel darted out the back door of Joe's home and sprinted down the street.

19.     Although it was snowing and only about 32 degrees, Daniel ran out of the house without socks, shoes, or a coat. He wore only a tank top and thermal long underwear. As soon as Daniel ran out of the house, Joe called 911 out of fear for Daniel's safety. During the 911 call, Joe advised that Daniel had been released from Strong Memorial Hospital two or three hours earlier, that he had been suicidal, and that he was worried Daniel might be a danger to himself.

20.     Immediately afterward, a dispatch went out to officers in the area (including Defendants Vaughn, Taladay, Santiago, Specksgoor, Harris, and Magri) describing Daniel's physical appearance and reporting that he had been released from the hospital two to three hours earlier and was suicidal.

21.     In response to the dispatch, Defendant Specksgoor and Rochester Police Officer Paul Ricotta reported to Joe's home. Joe told Defendant Specksgoor that Daniel had just run out

of the house wearing no coat or shoes, that he was worried about Daniel, and that Daniel needed help. Joe explained to the officer that Daniel was having mental health problems that evening and was recently released from the hospital after a suicide attempt.

22.     Meanwhile, Daniel was experiencing an acute mental health crisis. He was running through the street and had shed his tank top and long underwear along the way. Alone, naked, and seeking help, Daniel approached a tow-truck driver working in the area, knelt on the ground, and begged the driver to call 911. The driver could see Daniel's obvious need for help and called 911.

**Rochester Police Officers Locate Daniel But Instead of Providing Assistance,
They Abuse Him**

23.     Over the next few minutes, several Rochester Police Officers were dispatched to respond to calls about Daniel. Defendant Vaughn was the first to locate Daniel at 3:16 a.m.—near Jefferson Ave. and West Main St., about one mile from Joe's home.

24.     Defendant Vaughn emerged from his vehicle pointing a taser gun at Daniel. He ordered Daniel, who was completely naked, to lie down on the icy cold street, and Daniel immediately complied by lying flat on his stomach with his arms and legs splayed out.

25.     Defendant Vaughn then ordered Daniel to put his hands behind his back, which he did promptly, responding "Yes, Sir," and allowing Defendant Vaughn to easily handcuff him.

26.     At this point, Defendant Vaughn was aware Daniel was experiencing an acute mental health crisis and that Daniel was naked, obviously unarmed, and in serious danger from continued exposure to cold as he lay on the ground. Yet, instead of rendering any aid to Daniel, such as by covering his naked body to insulate him from the cold, or even inquiring about Daniel's condition, Defendant Vaughn left Daniel lying face down on the freezing asphalt road, naked, alone, and visibly terrified.

27.     In less than one minute (by 3:17:20 a.m.), six other officers—Defendants Taladay, Santiago, Harris, Specksgoor, and Magri—arrived at the scene and surrounded Daniel who remained cruelly splayed out on the road with his naked body uncovered, his bare skin pressed against the ice-cold pavement, and his hands cuffed behind his back as he pleaded for help.

28.     Upon his arrival, Officer Specksgoor confirmed that the man in the road was Daniel, who he knew to be experiencing a mental health crisis.

29.     Officer Vaughn told the other officers that Daniel had been compliant with his orders, noting "That was easy and fast!" in reference to handcuffing Daniel.

30.     At this point, an ambulance was already staging nearby, with medical personnel prepared to administer medication to Daniel that would calm him down. They were simply waiting for Rochester police officers to give them permission to enter the scene.

31.     Instead of permitting the ambulance and medical personnel access or providing any aid, comfort, or even attention to Daniel over the next several minutes, the Defendants at the scene—Vaughn, Taladay, Santiago, Harris, Specksgoor, Magri, and other as-yet-unidentified John Doe defendant officers—forced Daniel to remain handcuffed, naked, and lying face down on the freezing pavement. They stood around Daniel, chatting casually and making jokes at Daniel's expense.

32.     At the time, Daniel was in an obvious state of severe distress. He was rambling incoherently, and the Defendants at the scene laughed at him and repeated his words back to him in a mocking way.

33.     Obviously in extreme discomfort and terrified, lying naked, handcuffed, and face down on the freezing pavement, Daniel finally turned over onto his back, and eventually sat up.

34.     Around 3:18 a.m., Daniel spat toward the street a few feet away from where he was sitting and not in the direction of or anywhere near any of the officers. At 3:19 a.m., Defendant Vaughn snuck up from behind Daniel and pulled a spit hood over his head, which impaired his breathing, impaired his vision, and made him disoriented. The only part of Daniel's naked and freezing cold body that the Defendants ever sought to cover was his head–with a spit hood.

35.     Predictably, Daniel became significantly more distraught and agitated and began crying out, begging the officers to remove the spit hood.

**Defendant Officers Kill Daniel Prude**

36.      At 3:20 a.m., Daniel started to rock back and forth, in an apparent attempt to get up off the freezing ground where he had been forced to lie naked for several minutes. Instead of assisting Daniel to achieve greater comfort, the Defendants continued to abuse him. Before Daniel could get off the ground, however, Officer Vaughn forced Daniel back onto his stomach, face down.

37.     Next, Defendant Vaughn placed both of his palms on Daniel's head and Vaughn kicked his legs out into a pushup position, so that his full weight pressed Daniel's head and face into the freezing cold pavement.

38.     Defendants Taladay and Santiago joined Defendant Vaughn, and the three men together pinned Daniel to the ground with their body weight partially on his back and ribcage, rendering Daniel completely immobile.

39.     Immediately after the officers pinned Daniel against the cold pavement in this manner and position, Daniel's breathing became obviously obstructed. Daniel started loudly gurgling and sobbing between words, very clearly struggling to gasp for air.

40.     Instead of responding to the fact that their weight on his body was asphyxiating Daniel by relieving the force on his torso and removing the spit hood that were obstructing his breathing, the officers persisted in their use of deadly force continuing to apply their weight to Daniel's body for over 2 minutes and failing to remove the spit hood. As they had done since first arriving at the scene, instead of providing assistance, they meted out physical and verbal abuse.

41.     Daniel had done nothing whatsoever to warrant the officers' use of deadly force. Daniel had complied with police orders and was clearly in extreme distress and in urgent need of help.

42.     At 3:21 a.m., the police finally allowed the ambulance and paramedics to enter the scene. Paramedics were prepared to give Daniel medication to calm him down, but they did not ultimately administer it because the actions of Officers Vaughn, Taladay, and Santiago had asphyxiated Daniel before they had an opportunity to do so.

43.     By approximately 3:23 a.m., Daniel could no longer be heard gasping for air, went limp, and began expelling liquid from his mouth.

44.     Defendants Harris and Magri and possibly other as-yet-unidentified defendant officers observed their colleagues cruelly abuse and use deadly force against Daniel yet did nothing to intervene.

45.     Instead of immediately notifying the emergency medical technician ("EMT") at the scene about the alarming change in Daniel's condition, Defendants Vaughn, Taladay, and Santiago delayed taking any action for over one-minute, discussing Daniel's condition among themselves, with no sense of urgency, and complaining about how they were going to have to wash their gloves and pants on account of having touched Daniel.

46.     When one of the paramedics asked the officers about Daniel's body temperature to determine what type of sedative to administer, Defendant Taladay responded in a crude, joking manner, gesturing his finger toward Daniel's naked buttocks as if he was going to insert it into Daniel's anus like a thermometer.

47.     When the EMT noticed that something was seriously wrong and intervened, Defendant Vaughn told him that Daniel was not breathing.

48.     At 3:23:55 a.m., the EMT asked the officers to uncuff Daniel so that he could start CPR because CPR is not effective when the patient is handcuffed behind his back. The EMT turned Daniel's body so that Officer Vaughn could uncuff him, but instead of uncuffing him, Officer Vaughn walked casually toward his vehicle to apply more hand sanitizer to his gloves. He continued to move toward his vehicle even after hearing the EMT announce that Daniel had no pulse.

49.     As a result, the EMT had no choice but to begin CPR with Daniel's hands cuffed behind his back, and those initial rounds of potentially life-saving CPR were ineffective at resuscitating Daniel. The officers did not actually uncuff Daniel until almost two minutes later, at 3:25:47 a.m., at which point his brain had already been deprived of oxygen for at three to four minutes.

50.     At 3:27 a.m., the paramedic loaded Daniel into the ambulance on a gurney and took him to the hospital. The Rochester Police Officers watched as the paramedic unsuccessfully attempted to resuscitate Daniel through CPR until the moment he was loaded into the ambulance. Soon thereafter, Daniel was declared brain dead.

51.     Daniel was taken off life support and died on March 30, 2020.

**The City's Policy and Practice of Failure to Investigate and Discipline**
**Officers' Use of Excessive Force**

52.     In the period leading up to the RPD officers' fatal interaction with Daniel, the City of Rochester was well aware that it maintained an utterly broken system for reviewing and disciplining allegations of excessive force by its officers. This systemic failure was particularly pronounced with regard to incidents of the use of excessive force against people of color.

53.     Under the City's broken system, officers who are accused of using excessive force on members of the community were "investigated" by fellow RPD officers who were biased in favor of the accused officer and worked to protect their officers from facing meaningful scrutiny for their actions.

54.     Under this system, RPD had complete control over investigations of their own officers, and the RPD Chief of Police held final decision-making power on whether an officer's use of force was justified and whether RPD should discipline the officer.

55.     Under this system, the Chief of Police deemed nearly every use of force incident that RPD reviewed justified, no matter how plainly egregious the conduct, thereby ratifying the use of excessive force by RPD officers. The following are just a few examples of this rigged system designed to conceal rather than address the use of excessive force:

    a.  In January 2009, a 47-year-old Black man named Kerry Coleman called RPD to assist his wife who was experiencing a mental health crisis. After entering the home, RPD Officer Brian Cala pepper-sprayed Mr. Coleman's wife and punched her in the face several times. When Mr. Coleman tried to help her, another officer pepper-sprayed him. Mr. Coleman's wife was then forced to sit on their front steps in the cold, and when other family members came toward the house, saw her

injuries, and asked who hurt her, Cala yelled, "I fucking did it!" The City's review of Officer Cala's conduct resulted in a finding that his conduct was proper.

b.  In May 2013, Benny Warr, a 52-year-old Black man was in his motorized wheelchair waiting for a bus on Jefferson Avenue and Bartlett Street. RPD Officers Joseph Ferrigno and Anthony Liberatore ordered Warr to get off the street. When Warr replied that he was waiting for the bus, the officers pepper-sprayed him and tipped his wheelchair over, throwing him to the ground. The officers then kneed Warr in the stomach and struck him on the head, all without any lawful justification. The officers arrested Warr for alleged disorderly conduct and resisting arrest, but the charges were later dismissed. Even though much of the encounter was caught of video, the City's review of the incident concluded that the officers' conduct was proper.

c.  In September 2015, David Vann, a 23-year-old Black man was brutally beaten by RPD officers Jeffrey Kester, Matthew Drake, and Steven Mitchell. At the time, Mr. Vann was handcuffed and not resisting in any way. Although the beating was captured on video, the officers pursued false criminal charges against Mr. Vann, and Mr. Vann was ultimately acquitted. RPD officers involved in reviewing the incident helped cover up their fellow officers' misconduct. Among other things, the RPD investigators failed to take statements from key witnesses, manipulated paperwork, and prepared false official reports to protect their fellow officers from scrutiny. The City did not discipline any of the officers involved in the beating of David Vann. In fact, one of the officers, Steven Mitchell, held and continues to hold a leadership position in RPD, instructing other officers on use force.

d.  In August 2016, Rickey Bryant, a Black teenager was knocked off his bicycle, brutally beaten, tasered, and pepper sprayed by a group of at least six Rochester police officers who claimed to be looking for a man with a gun. Mr. Bryant did not have a gun and was not charged with any crime. Mr. Bryan's orbital bone was fractured and he later suffered from PTSD as a result of this incident. The City's review of the incident concluded that the allegations were "unfounded." Mr. Bryant filed a civil rights lawsuit in connection with the incident, which resulted in a settlement of $360,000.

e.  In April 2017, a man named Dkuan Webb was choked by RPD Officer Thomas Rodriguez in an incident that was recorded on Rodriguez's body worn camera. Although RPD officers arrested Mr. Webb and charged him with disorderly conduct, the charges were dismissed, and in July 2017, the City settled Mr. Webb's excessive force claims for $125,000. Officer Rodriguez is one of the officers involved in the August 2016 attack on Rickey Bryant, described above.

f.  In September 2017, RPD officers attacked a Black woman named Lentorya Parker, violently throwing her to the ground as she was picking her young daughter up from daycare. After Ms. Parker's daughter began screaming and crying for her mother, RPD officers told the child they were "sorry your mother is an animal." The officers arrested Ms. Parker and brought criminal charges, which were dismissed. Although the encounter was captured on a video that garnered significant media attention, on information and belief, the City did not discipline the officers for their misconduct.

g.  In May 2018, a Black man named Christopher Pate was severely beaten and tasered by RPD Officers Spenser McAvoy and Michael Sippell, who falsely claimed he

matched the description of a burglary suspect. The violent encounter was captured

on video. Although Officer Sippell lost his job at RPD after the incident, that was

only because he was convicted criminally in connection with beating Mr. Pate.

56.     On information and belief, in the past 10 years, in spite of numerous incidents of

use of excessive force by RPD officers, no RPD officer other than Sippell has lost his or her job

for engaging in excessive force.

57.     On information and belief, in the past 10 years, no other RPD officer has been

meaningfully disciplined for engaging in excessive force.

58.     On information and belief, over the period 2001-2016 the City has sustained less

than 2% of the excessive force complaints lodged against RPD officers. This rate is significantly

lower than the national average among police departments, which is around 8%.

59.     By 2018, the City's policy makers were aware the City's system for investigating

and disciplining police misconduct was completely ineffective at reigning in police abuses, and

this failure was particularly pronounced with regard to police abuses of black persons. Many of

the high-profile excessive force incidents described above resulted in significant protests and calls

for reform, of which the City's policy makers were made aware. These incidents also drew media

attention and led to lawsuits, of which the City's policy makers were also made aware.

60.     Nevertheless, the City's policy makers took no effective action to actually abate the

problem, leaving the broken system in place.

61.     As a result of the City's failure to meaningfully investigate or discipline officers

who engage in excessive force, RPD officers can mete out force against citizens with impunity

and take comfort in the fact their acts of violence will never be meaningfully scrutinized, even

when those acts are captured on video.

62.     One of the ways in which the system has failed most seriously is the manner in which RPD officers who review use of force incidents help cover up their fellow officers' misconduct.

63.     The RPD actions in the wake of the abuse and killing of Daniel Prude exemplifies this pattern of covering-up misconduct.  RPD officers reviewing the incident repeatedly demonstrated an obvious bias in favor of the officers and worked to conceal their misconduct.

64.     On the day following their encounter with Daniel Prude, Officers Vaughn, Taladay, and Santiago prepared Subject Resistance Reports ("SRR") to document their use of force against Daniel.

65.     These reports contained numerous lies, for example, that Daniel was "avoiding custody," was "assaultive," had "continuously" spat at officers prior to having the spit hood placed on his head, had threatened to "kill everyone," and that EMTs "immediately" began life saving measures after it appeared Daniel was not breathing.

66.     Additionally, Officer Vaughn prepared an incident report, which falsely stated that Daniel was "not injured" during the encounter.

67.     Later that day, an RPD investigator reviewing the incident reports directed the officers to re-write their reports, seeking "revisions" that were obviously intended to create an even more pro-police account of what occurred.  In particular, the investigator directed Officer Vaughn to change his SRR to include a post hoc rationalization for putting the spit hood on Daniel's face, specifically: "Due to the potential of contracting a virus, including corona virus."



the road. I ordered the male to the ground and cuffed him as trained. While the male was handcuffed he appeared to be under the influence of an unknown drug. The male asked officers for their guns several times. The male continuously spit in the direction of officers and I placed a spit sock on him. The male then said that he was going to kill everyone. The male once again began spitting at officers and said "give me that gun" several times while attempting to get up in the direction of Officer Taladay. I moved towards the male and segmented his head while he was on his stomach. The male began spitting again and I performed a hypoglossal nerve technique on his left side. I then noticed a clear liquid coming from Prude's mouth area and began observing his back in order to see his repirations. It appeared that Prude was not breathing properly and I had officers roll him to a recovery position on his left side. I then felt for his pulse, which I did not feel. AMR, who was already on scene immediately began life saving measures and transported Prude to Strong Hospital.

*spell?*        *> Jaw?*        *Who unhandcuffs?*

Officer:  ☒ Primary Officer    ☐ Assisting Officer    Name: Officer Mark Vaughn        ID# 2333

*Due to the potential of contracting a virus, including Corona Virus*

68.     The investigator also directed Officer Vaughn to change his incident report so Daniel was no longer listed as a "victim," but rather as a "suspect."

69.     The investigator also inexplicably decided not to interview Officers Vaughn, Taladay, and Santiago, even though he was presumably reviewing their conduct.

70.     After Daniel died on March 30, 2020, RPD investigators continued their efforts to conceal the officers' misconduct with an apparent attempt to influence the medical examiner's (ME's) review of the case. The investigator wrote in an email to the ME's office:[1]

> Daniel Prude Died ▆▆▆▆▆▆▆ yesterday at Strong Memorial. I imagine your office will be doing the autopsy. Can you and I have a conversation before you start that. It is somewhat sensitive, as he was in police custody when he was sent to the hospital. I was on scene and have all of the details for you. Try my office first, please at 428-883, then my cell at ▆▆▆▆▆▆
>
> Thank you,
> Mike

---

[1]     Redactions in this paragraph are contained in the source material cited and were not by Plaintiff's counsel.

71.     Contrary to the investigator's claim, video from the incident shows that he was not on the scene when Daniel stopped breathing, so he certainly did not have "all of the details." Likewise, the investigator had no legitimate need to give the ME off-the-record "details" over the phone.[2]

72.     On April 10, 2020, the ME's office emailed RPD investigators a preliminary cause of death report. The report stated:

> CAUSE OF DEATH **Complications of asphyxia in the setting of physical restraint**
> DUE TO: **Excited delirium**
> DUE TO: **Acute phencyclidine intoxication**
> OTHER SIGNIFICANT CONDITIONS:
> MANNER OF DEATH: **Homicide**

73.     Notwithstanding these clear written findings from the ME's office, RPD–at the highest level–persisted in efforts to conceal the truth about Daniel's death. After receiving this report on April 10, 2020, Chief Singletary sent an email to the City's public information officer Justin Roj, giving false information about the ME's findings:

> Today, the M.E.'s office ruled on Prude's death and determined such to be a "homicide" with the below attributing factors:
>
> - PCP in his system per toxicology reports
> - Excited Delirium
> - Resisting Arrest

74.     Chief Singletary provided the same false information about the ME's findings to City of Rochester's Mayor Lovely Warren and Corporation Counsel Tim Curtin.

---

[2]     As the City's Deputy Mayor James Smith later observed, the investigator's actions "certainly could leave one with the appearance of an attempt to influence the outcome of the ME's ruling on the manner of death and raises the question of whether such strategies to influence other agencies are used in other circumstances and how often they are successful."

75.     In addition to omitting the crucial fact that Daniel was asphyxiated as a result of "the setting of physical restraint," Chief Singletary continued to push the false narrative that Daniel resisted arrest and was to blame for his own death.

76.     The actions of RPD officers following Daniel's arrest reflect the City's deep seeded policy, culture, custom, and practice of refusing to hold its officers accountable for even the most egregious acts abuse.

<b>The City's Failure to Adopt Policies and Training to<br>Protect the Rights of People Experiencing Mental Health Crises Despite the Obvious Need</b>

77.     It is well-understood in the policing profession and by the City's policy makers that police officers must be prepared to interact appropriately with people experiencing mental health crises.

78.     RPD officers are routinely called to respond to situations where a person experiencing a mental health crisis is behaving erratically and sometimes posing a risk of harm to themselves or others.

79.     In many cases, like the case of Daniel Prude, the police are summoned specifically for the purpose of effectuating a mental hygiene arrest, *i.e.*, taking a person into custody for the express purpose of helping that person get needed emergency mental health treatment.

80.     It is also well-understood in the policing profession and by the City's policy makers that if police officers are not properly trained on how to interact appropriately with people experiencing mental health crises, police interactions are likely to escalate unnecessarily, resulting in injury or death to the person in need of help.

81.     It is also well-understood in the policing profession and by the City's policy makers that in order to mitigate the risk of harm to citizens who encounter police while experiencing

mental health crises, municipalities must adopt policies and train their officers on subjects like de-escalation and obtaining prompt access to appropriate medical and mental health interventions.

82.     Prior to Daniel Prude's fatal encounter with RPD officers, the City's policymakers knew to a moral certainty that their officers would encounter citizens like Daniel Prude, who behave erratically and need emergency mental health treatment.

83.     The City's policymakers also knew to a moral certainty that without training and policies in place to guide officers on how to interact with people experiencing mental health crises, police officers are likely to make choices and take actions during these encounters that will cause the deprivation of a citizen's constitutional rights, including by either using excessive force against them or denying them needed care, or both.

84.     While the need for these policies and training was patently obvious, a series of prior tragic encounters with RPD officers and persons experiencing mental health crises also put the City's policy makers on notice of the need for policies and training in this area.

     a.     For example, in July 2005, RPD Officer Mark Simmons responded to a 911 call from a Black resident named Katrina Perkins, who reported that she was worried for her 13-year-old daughter who was suicidal and locked herself in a bathroom with a knife. When Officer Simmons entered the home, he shot the child three times without warning, causing serious permanent injuries. Officer Simmons then claimed that the girl was holding a knife when he shot her, which the family disputed. Regardless, the RPD officers knew that the child had a knife and that they were summoned to the home for the purpose of helping to keep the child safe, not to shoot her.  The City reviewed Officer Simmons's conduct and found that he acted properly. In fact, RPD's then-Chief David Moore named Officer Simmons "officer

of the month" in connection with his use of deadly force against the child suffering
from a mental health crisis. Officer Simmons was promoted to sergeant soon after
the incident and is currently a Deputy Chief of the Rochester Police Department.

b.   As noted in Paragraph 55(a), above, in January 2009, a 47-year-old Black man
called RPD to assist his wife who was experiencing a mental health crisis. Instead
of providing access to mental health service, the RPD officer who responded to the
scene pepper sprayed and punched the man's wife. The City reviewed the officer's
conduct and found his actions were proper.

85.     Notwithstanding this knowledge, the City's policymakers failed to implement
appropriate training or policies that would have equipped officers to mitigate rather than aggravate
the risk of harm to Daniel Prude during his encounter with RPD officers.

86.     The City's failure to implement appropriate policies and training in this area thus
constituted an official policy or custom of the City and demonstrated deliberate indifference to the
rights of people like Daniel Prude, who are taken into custody in connection with experiencing
mental health crises and who need emergency treatment.

87.     As a result of the City's failure to implement policies and train its officers in this
way, officers violated Daniel Prude's Fourth and Fourteenth Amendment rights, by subjecting him
to excessive force and denying him needed medical care.

88.     When videotape of the officers' violent encounter with Daniel Prude became public
national news in September 2020, the officers' conduct drew widespread public outrage in
Rochester, around the country, and internationally. For days, protestors took to the streets,
demanding change.

89.     To save political face, Rochester's Mayor Lovely Warren fired the Chief of Police La'Ron Singletary and publicly acknowledged that the RPD officers "failed" Daniel Prude.

90.     Nevertheless, the City's official policy failures in this area are so deeply entrenched that they continue unabated to this day.

91.     Just over a month ago, on January 29, 2021, Rochester police officers responded to the home of Elba Pope, a black woman whose 9-year-old daughter was having a mental health crisis. The child made suicidal statements and ran from the home. Rochester police officers placed the child under arrest, handcuffing her. When the child resisted the officers' demands to get into the back of their police car, they pepper-sprayed the handcuffed child in her face.

**COUNT ONE:**
**42 U.S.C § 1983 – Fourth Amendment**

92.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

93.     As described more fully above, Defendants Vaughn, Taladay, and Santiago used excessive force against Daniel Prude, in violation of Mr. Prude's Fourth Amendment rights.

94.     As described more fully above, Defendants Magri, Harris, and possibly other as-yet-unidentified defendant officers observed the violation of Mr. Prude's Fourth Amendment rights, yet failed to intervene to stop the violation, despite having had a realistic opportunity to do so.

95.     As described more fully above, in the period preceding Mr. Prude's fatal encounter with RPD, the City maintained an official policy that was the moving force behind the violation of Mr. Prude's Fourth Amendment rights. As discussed more fully above, it was obvious to the City's policy makers that its system for reviewing use of force incidents and disciplining officers involved was utterly broken. Rather than holding officers accountable, the system encouraged the

cover up of acts of excessive force, thereby tacitly condoning the use of excessive force by officers and in some instances even ratifying it at the policy making level. Notwithstanding the obvious need for a better and constitutionally compliant system, the City's policy makers took no action to actually abate the problem, leaving the broken system in place.

96.    The misconduct described in this count was undertaken in an objectively unreasonable manner and/or with deliberate indifference to Mr. Prude's rights.

97.    As a result of the misconduct described in this count, Mr. Prude suffered physical pain, physical injury, emotional distress, and died.

## COUNT TWO:
## 42 U.S.C § 1983 – Fourteenth Amendment

98.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

99.    In the manner described more fully above, Defendants Vaughn, Taladay, Santiago, Magri, Specksgoor, Harris, and possibly other as-yet-unidentified defendant officers acted with deliberate indifference to Daniel Prude's objectively serious medical/mental health needs. These defendants failed to take reasonable measures in response to Daniel Prude's medical condition, which they knew or should have known posed an excessive risk to Daniel Prude's health or safety.

100.    In the manner described more fully above, the City maintained an official policy that was the moving force behind the violation of Daniel Prude's Fourteenth Amendment rights. The City failed to implement policies and training that it knew were required to mitigate risk of harm to people who interact with RPD officers while experiencing mental health crises.

101.    The misconduct described in this count was undertaken intentionally, recklessly, and/or with deliberate indifference to Daniel Prude's rights.

102.     As a result of the misconduct described in this count, Mr. Prude suffered physical pain, physical injury, emotional distress, and died.

## COUNT THREE:
## Americans with Disabilities Act, 42 U.S.C. §§ 12131-34

103.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

104.     At the time of Daniel Prude's encounter with Rochester police, he was a qualified person with a disability who met the essential eligibility requirements for the receipt of safe police services.

105.     In the manner described more fully above, the City of Rochester violated Daniel Prude's rights under the ADA by failing to provide reasonable disability accommodations, for example, the use of calming, de-escalation, and/or crisis intervention techniques to effectuate his mental hygiene arrest.

106.     As a result of the City's failure to accommodate Daniel Prude, he was excluded from receiving safe police services on account of his disability, which caused him to suffer greater injury than a non-disabled arrestee and resulted in his death.

107.     The misconduct described in this count was undertaken with deliberate indifference to Daniel Prude's rights.

## COUNT FOUR:
## Section 504 of the Rehabilitation Act

108.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

109.    At the time of Daniel Prude's encounter with Rochester police, he was a qualified person with a disability who met the essential eligibility requirements for the receipt of safe police services.

110.    At the time of Daniel Prude's encounter with Rochester police, the City of Rochester received federal funds.

111.    In the manner described more fully above, the City of Rochester violated Daniel Prude's rights under Section 504 of the Rehabilitation Act by failing to provide reasonable disability accommodations, for example, the use of calming, de-escalation, and/or crisis intervention techniques to effectuate his mental hygiene arrest.

112.    As a result of the City's failure to accommodate Daniel Prude, he was excluded from receiving safe police services on account of his disability, which caused him to suffer greater injury than a non-disabled arrestee and resulted in his death.

113.    The misconduct described in this count was undertaken with deliberate indifference to Daniel Prude's rights.

### COUNT FIVE:
### Common Law – Intentional Infliction of Emotional Distress/
### Outrageous Conduct Causing Emotional Distress

114.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

115.    In the manner described more fully above, Defendants Vaughn, Taladay, Santiago, Magri, Specksgoor, Harris, and possibly other as-yet-unidentified defendant officers, in handcuffing Daniel Prude, forcing him to lay naked on the freezing pavement for a long period of time, and taunting him while he was experiencing a serious mental health crisis, the Defendants are liable to Plaintiff and the Estate for intentional infliction of emotional distress and outrageous

conduct causing emotional distress committed against Daniel Prude.  The acts and omissions of the individual Defendant police officers were all committed within the scope of their employment and duties as police officers employed by the City Police Department. Accordingly, the City is also liable under the doctrine of respondeat superior.

116.    The actions of these Defendants in forcing him to lay naked on the freezing pavement for a long period of time and taunting him while he begged for help was intentional and/or reckless.

117.    The conduct of these Defendants towards Daniel Prude were so shocking and outrageous that it exceeds all reasonable bounds of decency.

118.    As a result of the intentional infliction of emotional distress and outrageous conduct of these Defendants, Daniel Prude suffered severe emotional pain and suffering and trauma from the time he was first ordered to lay naked on the frozen pavement to the point where he lost consciousness as a result of these Defendants' actions.

119.    The emotional distress suffered by Daniel Prude as a result of these Defendants' actions was severe in that it was of such intensity and duration that no reasonable person should be expected to endure it.

**COUNT SIX:**
**Common Law Battery**

120.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

121.    As described more fully above, Defendants Vaughn, Taladay, and Santiago used excessive force against Daniel Prude, and are liable to Plaintiff and the Estate in common law battery.

122.    As described more fully above, Defendants Vaughn, Taladay, and Santiago intentionally touched Daniel Prude without his consent and caused an offensive bodily contact when they used excessive force on him.

123.    As described more fully above, Defendants Vaughn, Taladay, and Santiago's conduct in intentionally touching Daniel Prude was offensive and was objectively unreasonable and unnecessary under the circumstances.

124.    As described more fully above, Defendants' use of excessive force was for the purpose of harming Daniel Prude that offends a reasonable sense of personal dignity and is otherwise wrongful.  The acts and omissions of the individual Defendant police officers were all committed within the scope of their employment and duties as police officers employed by the City Police Department. Accordingly, the City is also liable under the doctrine of respondeat superior.

125.    As a result of the excessive force used by Defendants Vaughn, Taladay, and Santiago, Daniel Prude suffered injuries that resulted in conscious pain and suffering and eventually led to his death.

### COUNT SEVEN:
### Common Law Negligence, Gross Negligence, and Wrongful Death

126.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

127.    Defendants owed Daniel Prude a duty of reasonable care when Defendants Vaughn, Taladay, and Santiago and possibly other as-yet-unidentified defendant officers encountered him in the early morning hours of March 23, 2020, experiencing a severe mental health crisis.

128.    Defendants Vaughn, Taladay, and Santiago breached such duty of reasonable care to Daniel Prude and acted with gross negligence and reckless indifference to his safety and his life

by forcing him to lay naked on the freezing pavement; placing a spit hood over his head obstructing his breathing and causing him to become more agitated and disoriented; using excessive force to hold him down on the pavement and compromising his ability to breath; failing to release the excessive force when he stopped breathing; failing to call in the EMTs on the scene to immediately begin resuscitative efforts; failing to immediately remove his handcuffs to allow CPR to be properly administered; and being otherwise indifferent to his suffering and safety.

129.    Defendants Harris and Magri and possibly other as-yet-unidentified defendant officers breached the duty of care they owed to Daniel Prude by standing by and observing their colleagues cruelly abuse and use deadly force against Daniel and failing to intervene to protect Daniel and save his life, both before excessive force was applied to asphyxiate him, and after he stopped breathing and required immediate resuscitation.

130.    The acts and omissions of the individual Defendant police officers were all committed within the scope of their employment and duties as police officers employed by the City Police Department. Accordingly, the City is also liable under the doctrine of respondeat superior.

131.    As a direct and proximate result of Defendants' negligence, gross negligence, and reckless indifference, Daniel Prude suffered severe physical and emotional pain and suffering and was caused to die.

**Damages**

132.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

133.    Based upon the facts and legal Claims set forth above, Plaintiff, on behalf of the Estate, is entitled to an award of compensatory damages for Daniel Prude's severe physical and emotional pain and suffering.

134.    Based upon the facts and legal Claims set forth above, Plaintiff, on behalf of Daniel Prude's distributees (his five children), is entitled to an award compensatory damages against all Defendants for causing Daniel Prude's wrongful death, including the pecuniary value of their loss of support, nurturing, and guidance incurred as a result of the death of their father.

135.    Based upon the facts and legal Claims set forth above, Plaintiff, on behalf of Daniel Prude's Estate and distributees, is entitled to an award against all Defendants of loss-of-life or hedonic damages for the death of Daniel Prude caused by the deprivation of his civil rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

136.    Based upon the facts and legal Claims set forth above, and specifically the intentional, reckless, and grossly negligent conduct of the individual Defendants, Plaintiff, on behalf of the Estate and distributees, is entitled to an award of punitive damages against the individual Defendants.

## Jury Demand

137.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues so triable.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants for compensatory damages, punitive damages, and attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

Dated: June 8, 2021

Respectfully Submitted,

FARACI LANGE, LLP

By: /s/Stephen G. Schwarz
Stephen G. Schwarz
Lesley E. Niebel
28 East Main Street, Suite 1100
Rochester, New York  14614
Tel: 585.325.5150
Fax: 585.325.3285
sschwarz@faraci.com
lniebel@faraci.com

Matthew J. Piers
Mark S. Dym
Elizabeth Mazur
Margaret Truesdale
HUGHES SOCOL PIERS RESNICK &
DYM, Ltd.
70 W. Madison Street Suite 4000
Chicago, Illinois  6060
Tel: 312.580.0100
Fax: 312.580.1994
mpiers@hsplegal.com
mdym@hsplegal.com
emazur@hsplegal.com
mtruesdale@hsplegal.com

Adam D. Ingber
ADAM DAVID INGBER, P.C.
150 North Michigan Ave., Suite 2800
Chicago, Illinois  60601
Tel: 312.853.3588
Fax: 312.276.8844
ingberlaw@gmail.com

*Attorneys for Plaintiff*